John M. DOWD, Plaintiff,

v.

Samuel Ray CALABRESE, Defendant.

William M. KRAMER, Plaintiff,

v.

Samuel Ray CALABRESE, Defendant.

William M. KRAMER, Plaintiff,

v.

James A. DRINKHALL, et al., Defendants.

John M. DOWD, Plaintiff,

v.

James A. DRINKHALL, et al., Defendants.

James A. DRINKHALL, Plaintiff,

v.

William M. KRAMER, Defendant.

Civ. A. Nos. 80–0911, 80–0912, 80–3324, 80–3325 and 81–1266.

United States District Court, District of Columbia.

Jan. 26, 1984.

Thomas C. Green, Washington, D.C., for plaintiffs.

Michael T. Kenney, Santa Ana, Cal., Michael M. McCarty, Sara E. Lister, Togo D. West, Patterson, Belknap, Webb & Tyler, Washington, D.C., Gregory L. Diskant, Patterson, Belknap, Webb & Tyler, New York City, Richard L. Levie, U.S. Dept. of Justice, Civ. Div., John C. Martin, Asst. U.S. Atty., Washington, D.C., for defendants.

## OPINION

HAROLD H. GREENE, District Judge.

This is a libel action revolving around charges printed in the *Wall Street Journal* that the plaintiffs Kramer and Dowd Department of Justice strike force attorneys, engaged in improper conduct in pressuring one Samuel Calabrese, an organized crime figure, into becoming a government witness. The Court previously disposed of disputes centering on the efforts of the plaintiffs to discover the identity of the sources of Jim Drinkhall, author of the *Wall Street Journal* articles. *Dowd v. Calabrese*, 577 F.Supp. 238 (D.D.C.1983). The current set of motions concerns discovery directed at the Department of Justice and the Internal Revenue Service (which is resisted on the basis of various privileges) and plaintiffs' efforts to compel the deposition of one of defendants' counsel and to require the production of certain documents.

### I

#### Documents from the Department of Justice

The defendants filed a motion to compel the production of documents from the Department of Justice, a non-party, pursuant to Rule 37, Fed.R.Civ.P., the Department moved for a protective order under Rule 26(c), Fed.R.Civ.P., and all of the interested

entities and individuals filed a number of briefs and other documents.[1] The differences between defendants and the Department relate to many documents and cover a broad range of issues, as follows.

#### A. *Memoranda Prepared by Kramer and Dowd*

Defendants seek three memoranda prepared by Kramer and Dowd recommending the prosecution of Calabrese. The Department of Justice resists this request, contending that these materials are protected by the deliberative process privilege.

 Privileged matters are, of course, outside the scope of discovery. Rule 26(b), Fed.R.Civ.P.; *Hickman v. Taylor*, 329 U.S. 495, 508, 67 S.Ct. 385, 392, 91 L.Ed. 451 (1947). Among the privileges which have long been recognized is that which protects from disclosure those intragovernment documents which reflect advisory opinions, recommendations, and deliberations comprising part of the process by which governmental decisions and policies are formulated. *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena*, 40 F.R.D. 318, 324 (D.D.C. 1966), aff'd sub nom, *V.E.B. Carl Zeiss, Jena v. Clark*, 384 F.2d 979 (1967); *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150, 95 S.Ct. 1504, 1516, 44 L.Ed.2d 29 (1975); *McClelland v. Andrus*, 606 F.2d 1278, 1287 (D.C.Cir.1979); *United States v. Am. Tel. & Tel.*, 86 F.R.D. 603, 637 n. 1 (D.D.C. 1979). The purpose of the privilege is to foster freedom of expression among governmental employees so as to promote creative debate and candid consideration of alternatives. *Jordan v. Department of Justice*, 591 F.2d 753, 772 (D.C.Cir.1978). Factual matters are encompassed by the privilege if they are inextricably intertwined with the process by which policy is made or if the manner of selecting or presenting the facts would reveal the delib-

---

**1.** Originally, the defendants caused a *subpoena duces tecum* to be served on the Department pursuant to Rule 30(b)(6), Fed.R.Civ.P. The Department indexed many documents, and some agreements were reached to narrow the scope of the subpoena. However, differences still exist regarding the scope of defendants' request. For example, the Department accurately notes that defendants make such unspecific demands as "conversations of 'other critical witnesses,'" and "other relevant documents." Points and Authorities at 4 n. **. See also note 11 *infra*.

erative process. *Ryan v. Department of Justice,* 617 F.2d 781, 790 (D.C.Cir.1980); *Soucie v. David,* 448 F.2d 1067, 1077–78 (D.C.Cir.1971).

■ The deliberative process privilege is not absolute, however. Its validity depends in particular circumstances upon a balancing of the public interest in nondisclosure with the need for the information as evidence. *United States v. Am. Tel. & Tel.,* 524 F.Supp. 1381, 1386 n. 14 (D.D.C. 1981). Among the factors to be considered when the balance is struck are the relevance of the document, alternative means of proof, and the presence of allegations of governmental misconduct. *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena, supra,* 40 F.R.D. at 327–29.

The plans Dowd and Kramer may have had with regard to Calabrese and the statements they made to Drinkhall about those plans are a major issue in this litigation. The memoranda those two plaintiffs wrote when they recommended the prosecution of Calabrese are plainly of the highest relevance on that issue.[2] To the extent that a declaration submitted by the Acting Attorney General may be read to make a claim to the contrary,[3] it is simply wrong.

The Department argues that the defendants have available to them the opportunity to prove the particular facts relating to the prosecutors' intentions in regard to Calabrese by other means, *i.e.,* by revelation and use of Drinkhall's sources. Points and Authorities at 14. It is questionable whether Drinkhall's sources would be as useful in supplying proof of the states of mind of Dowd and Kramer as are their own memoranda recommending Calabrese's prosecution. Moreover, the Court has previously expressed its reluctance to require additional disclosure in the sensitive area of Drinkhall's sources, as well as the reasons for that reluctance,[4] and it sees no basis for altering that judgment in the present context. Defendants will not be penalized with respect to their own legitimate discovery requests because they exercise the right, bottomed in the First Amendment, to keep their sources confidential.

■ The deliberative process privilege is an important privilege, and in many situations it will shield documents from disclosure. Indeed, as developed in Part B *infra,* the Court sustains that privilege in circumstances where relevance and need are not clear. But the particular documents which embody the views of the plaintiffs as to why and how Calabrese should be prosecuted represent a concrete and particularized basis for disclosure which far outweighs the government's generalized interest in the confidentiality of its deliberations.[5]

If any doubt remained on that score, it would be disspelled by the fact that we are here operating in the area of a claim of governmental misconduct. It is not necessary to decide—and the Court does not decide—that this claim is sufficiently valid that it would be adequate, standing by itself, to overcome the Department's claim of privilege. But the allegations of misconduct which lie at the heart of the defense

---

2. Calabrese was convicted in September 1976 in the U.S. District Court for the Eastern District of Virginia of interstate transportation of a cashier's check purchased by fraud, bribery, and conspiracy to engage in racketeering, and in December 1976 of making false declarations before a grand jury, and he was sentenced to a total of six years. In 1978, Calabrese was convicted in the U.S. District Court for the District of Utah of interstate transportation of stolen property and racketeering, and sentenced to eight years. *United States v. Calabrese,* 645 F.2d 1379 (10th Cir.1981).

3. The Department's Points and Authorities in support of its motion for a protective order states (at 14) that this is what Deputy Attorney General Smults declared. Actually, that declaration merely asserts that the documents are privileged; it does not assert lack of relevancy.

4. See Memorandum of October 26, 1983.

5. Likewise unpersuasive is the Department's reliance on grand jury secrecy. As *SEC v. Dresser Industries,* 628 F.2d 1368 (D.C.Cir.1980), the decision principally relied on by the Department, indicates, it is not a valid defense to a request for disclosure that the data may also have been revealed to a grand jury. 628 F.2d at 1382.

of this case [6] to lend additional support for the decision to require the disclosure of the documents.[7] For these reasons, the Court will require the Department of Justice to make the three prosecution memoranda available to the defendants.[8]

■ Reference is made in some of defendants' papers to redactions in memoranda written by Kramer to his Department of Justice supervisors in which he allegedly reacted to Drinkhall's allegations against him and to transcripts of the interviews of Kramer and Dowd by a Justice Department investigator. See, e.g., Supplemental Memorandum at 11 n. *.[9] In view of the possible significance of these documents, the Court will require the Department to produce them to the Court for an *in camera* inspection so that a determination may be made whether the redactions should stand in light of the principles discussed above.

### B. *Hantman Report*

Within a few days after the publication of the first *Wall Street Journal* article, Alfred Hantman, Special Litigation Counsel in the Justice Department's Criminal Division, was assigned by the Department to conduct an investigation of the charges contained in the article. After a two-month inquiry, Mr. Hantman authored a lengthy report which was accompanied by a number of exhibits and appendices. The De-

partment released to defendants almost all of the report, with the exception of the last section which contained Hantman's conclusions and recommendations.[10]

In the conclusion section of the report, Hantman evaluated the witnesses he interviewed; he gave his views regarding the credibility of the allegations in the Drinkhall article and the possible violation by anyone of congressional enactments or the Department's standards of conduct; and he made recommendations to his superiors on future courses of action, both with respect to the article and to Department policies in general.

■ It is difficult to imagine material more clearly protected by the deliberative process privilege. Evaluations of facts and recommendations to superiors regarding possible consequences and governmental actions are precisely the types of expressions which the privilege is intended to protect. At the same time, the defendants make only a very weak showing of necessity. Hantman's conclusions and recommendations add nothing or almost nothing (in an evidentiary sense) to the facts themselves. Unlike the facts recited in the report, they do not enhance a resolution of the question of truth or falsity of the article. Indeed, Hantman's opinions would probably be rejected on relevancy grounds if offered into evidence.[11]

---

6. The claim of misconduct is not unavailable to these defendants merely because Calabrese's convictions were affirmed. Compare Department of Justice Reply at 3.

7. To be sure, the claim of privilege is the government's, not that of Dowd and Kramer. Nevertheless, it is a fact that the underlying basis of the privilege is the protection of subordinate employees from reprisal or embarrassment. Here, the employees who would be sought to be protected have brought this lawsuit, and they have thus placed in issue their activities in regard to Calabrese. The Department's interest, by contrast, whatever it may be in theory, is somewhat attenuated in actuality, for Dowd and Kramer no longer even work there.

8. There is also discussion in the papers both in regard to the prosecution memoranda and the Hantman report (see *infra*) in terms of work

product. The operative factors on both sides of that issue are sufficiently similar in this context to the deliberative process question to require the same outcome. See note 38 *infra*.

9. The papers themselves were furnished to defendants.

10. A few redactions were made also in the remainder of the report, and while defendants do not affirmatively agree that these are justified, they do not appear seriously to press any claim in that regard.

11. In their Supplemental Memorandum, defendants appear to abandon their request for the concluding section of the Hantman report and they demand instead "all [unspecified] internal documents generated by Kramer and Dowd relating to the Calabrese prosecutions and the other [equally unspecified] relevant internal documents withheld because of the deliberative

The motion for a protective order with respect to those portions of the Hantman report not turned over the defendants will therefore be granted.

### C. *Grand Jury Transcripts*

Defendants have requested transcripts of the investigations of Calabrese before grand juries in U.S. District Courts in Virginia and Utah; of every appearance of Calabrese before any grand jury anywhere; and of every appearance before a grand jury of Al Marchini, a defendant in the Utah case who was acquitted.[12]

The Department initially opposes the request on the basis that defendants should have filed a motion under Rule 6(e), Fed.R. Crim.P., in the court having custody of the grand jury materials,[13] and that, since defendants have failed to do so, their request should be summarily dismissed. That objection is not well taken.

■ The Supreme Court suggested in *Douglas Oil v. Petrol Stops Northwest*, 441 U.S. 211, 99 S.Ct. 1667, 60 L.Ed.2d 156 (1979), that when a demand for grand jury materials is made, a bifurcated procedure be adopted: the court in which the case is pending to determine relevance and the court in which the grand jury was convened to rule on the need for continued secrecy. This procedure was further refined by Judge Sirica in *United States v. Alston*, 491 F.Supp. 215 (D.D.C.1980),

where it was held that application should be made first to the court in which the principal action lies for certification that disclosure is warranted from the point of view of that action, and only then, if and when such a certification is obtained, should application be made to the grand jury court for its determination with regard to secrecy. That procedure is particularly appropriate where, as in this case, the defendants are requesting grand jury materials from a number of different districts,[14] and where it would make no sense to require them to apply to courts in all these districts before there has been a determination that the materials would be at all relevant. The Court thus approves the procedure proposed by defendants. However, substantively their claim to the grand jury materials must fail.

■ Defendants contend that the grand jury transcripts are likely to reveal that Dowd and Kramer threatened or abused Calabrese and Marchini, thus supporting the truth of Drinkhall's article. The Department scoffs at this, arguing that

[i]t is highly improbable that statements were made in the grand jury room that the purpose of the Virginia and Utah prosecutions were to pressure Mr. Calabrese into cooperating.

Memorandum at 18–19.

The Court agrees with that analysis. To be sure, defendants quote from statements

---

process privilege." Supplemental Memorandum at 4. It is difficult to tell what that means except perhaps the Kramer and Dowd memoranda discussed *supra*.

These demands, as well as several others, are troublesome because of their lack of specificity and the burden this imposes on the recipients of defendants' demands. In some pleadings defendants appear to call for certain documents, in others they abandon those requests (or at least they do not defend or support them); in still other pleadings, they claim to provide greater specificity but those claims are sometimes illusory on closer examination. See Department of Justice Reply at 2, 15–17; Defendants' Second Supplemental Memorandum at 15–18.

The Court does not expect to keep ruling on ever-changing requests. However, in order not to penalize any party on account of the fuzziness of its demands, the Court is prepared to entertain one more round of precisely focused support for previously-demanded discovery.

However, in that regard, the Court expects the parties to use more restraint than they have in the past (see note 17 *infra*), and it expects the necessary papers, if any, to be filed in short order.

**12.** Marchini was investigated for obstruction of justice following his acquittal in Utah. That investigation was described in one of the Drinkhall articles.

**13.** Actual custody of the materials appears to lie in the Department of Justice. Nevertheless, it may be assumed for purposes of the present motions that the courts which empanelled the grand juries have control. In any event, the custody question does not affect the substantive result.

**14.** Defendants claim that the Department has, in fact, refused to inform them in which districts Calabrese and Marchini had appeared.

made by Kramer to the effect that the grand jury's jurisdiction is broad and so is also the discretion of the prosecutor in presenting matters to that body.[15] But those are simply statements of obvious fact.[16] It is, no doubt, conceivable, that, somehow, a grain of evidence (or a lead to admissible evidence) may be gleaned from these grand jury transcripts. But that contingency is so remote that their request must be characterized as a fishing expedition,[17] insufficient to overcome traditional grand jury secrecy.[18]

There is some appeal to defendants' complaint that Dowd and Kramer have an advantage of a kind in that they were present in the grand jury room when defendants were not. But that alone is obviously insufficient in the Rule 6(e) context. Moreover, the defendants have advantages of their own: they know—or at least Drinkhall knows—who his sources were and what these sources did and did not tell him, but Dowd and Kramer lack that knowledge. The Court recited this, not to posit some artificial kind of symmetry,[19] but simply to make the obvious point that, where

privileges are involved, the party which is able to rely on a particular privilege will know facts of which his opponent may be unaware.[20] The privilege may be overcome where the need is substantial. That, in the opinion of the Court, is not true here, and the request for grand jury materials will therefore be denied.

### D. *Wiretap Information*

■ Defendants seek disclosure of two wiretaps, one which overheard remarks made by Allen Dorfman[21] about the *Wall Street Journal* and about "Drink," the other involving Joseph Blasko, a Salt Lake City police officer, who allegedly stated to an organized crime figure that Calabrese was testifying before a grand jury and that he "ought to be dead." Defendants claim that the Dorfman tap would support their defense of truthfulness or lack of actual malice in that it would substantiate their story that Kramer was spreading rumors about an organized crime figure who had been overheard speaking favorably about Drinkhall. As for the Blasko tap, it is

---

**15.** See, generally, Defendants' Supplemental Memorandum at 12–14.

**16.** This Court might agree in the abstract that the grand jury's responsibilities have in practice become fundamentally altered from what was intended when the Fifth Amendment was adopted as a safeguard against governmental abuse of the citizen. But this motion is not the proper forum in which to litigate that philosophical question.

**17.** It is no less so merely because defendants here, as well as on every issue, describe the requested material in such terms as "central," "critical," "overwhelming," "explosive," "dramatic," or "nothing could be more important." It is difficult to believe that these adjectives and descriptions can legitimately be applied to virtually every document that defendants wish to have produced. The Court cannot help but observe that, even if due account is taken of the stakes involved in this lawsuit, there is an unfortunate tendency—and perhaps not only by one side—to cloak the arguments in unwarranted hyperbole.

**18.** Moreover, defendants may question such witnesses as Calabrese and Marchini without running afoul of Rule 6(e). See *Application of Eisenberg*, 654 F.2d 1107, 1113 n. 9 (5th Cir. 1981). If Calabrese or Marchini felt threatened

or abused by Kramer or Dowd, they would presumably know it.

**19.** Compare, defendants' claim that "simple simple fairness dictates an evenhanded application of the principles governing discovery in this case." Memorandum in Support of Motion to Compel at 4.

**20.** Similar reasoning disposes of defendants' repeated lament (*e.g.*, Motion to Compel at 3–4) that a dual standard exists because Kramer and Dowd may be able to secure information through their former contacts within the Department of Justice. Even if that were true—and we do not know that it is—the remedy would not be to open the files of the Department to defendants irrespective of grand jury secrecy, wiretap statutes and the like. The Department has stated (Points and Authorities at 25–26), without contradiction, that, apart from whatever information Kramer and Dowd may have been able to secure by informal means from former colleagues, the Department has not employed a dual standard between the parties but has treated them with strict equality and neutrality.

**21.** Dorfman was a Chicago businessman with alleged organized crime connections.

argued that it would help to prove that false rumors of Calabrese's cooperation with the government were circulating among members of organized crime during the 1978–79 period. Beyond all that, defendants allege that the contents of the wiretaps are already public and that therefore Title III of the Omnibus Crime Control and Safe Street Act, upon which the Department relies in support of its claim of confidentiality, does not apply.[22]

■ There are several problems with this request. In the first place, section 2517(3) of Title III (18 U.S.C. § 2517(3)) explicitly provides for disclosure only "while [the individual is] giving testimony under oath or affirmation." See *United States v. Dorfman,* 690 F.2d 1230, 1231 (7th Cir.1982). That is not what is involved here.[23] Moreover, as defendants ultimately acknowledged,[24] an entire wiretap does not become public merely because a portion has been publicly disclosed. To the extent, therefore, that the Dorfman and Blasko taps are public, defendants are free to use them; to the extent that they are not, they need not be disclosed absent a Court order upon the requisite showing.[25]

Next, insofar as the Dorfman wiretap is concerned, there is the further difficulty that Judge Parsons of the U.S. District Court for the Northern District of Illinois ordered the sealing of all intercepts made in the course of the Dorfman investigation—a matter pending in that court. Moreover, the Court of Appeals for the Seventh Circuit has previously held that the

> only lawful way [wiretaps] can be made public over the defendants' objection is by being admitted into evidence ... in some ... public proceeding within the scope of § 2517(3).

*United States v. Dorfman, supra,* 690 F.2d at 1233.

Without deciding that, as the Department argues, only the tribunal which originally authorized the surveillance may order the transcripts produced, that tribunal surely has the best perspective from which to make a disclosure decision, and it is to that tribunal to which an application should be made regarding a modification of its own sealing order. Finally, the Court notes that defendants' claims of relevance of this material to the instant lawsuit, while not without any basis whatever,[26] are quite tenuous.

■ The request of the defendants for the disclosure of the wiretap transcripts will be denied, without prejudice to an application for their production to the courts which authorized the intercepts and required the sealing.[27]

---

**22.** Title III serves a dual purpose: (1) to protect the privacy of individuals, and (2) to enable the government to obtain information necessary for effective law enforcement. *Zerilli v. Evening News Ass'n,* 628 F.2d 217, 219 (D.C.Cir.1980).

**23.** Defendants' bootstrap argument—that they seek disclosure as part of the testimony of a Department of Justice representative at their deposition—does not satisfy the statutory standard.

**24.** Defendants' Second Supplemental Memorandum at 13.

**25.** With respect to the Blasko tap, defendants wish to have the Department authenticate portions of the transcript already in the public domain, and with respect to the Dorfman tap they seek "detailed disclosure only of ... limited portions [which] have already been disclosed in summary form." Defendants' Second Supplemental Memorandum at 14. But defendants do not require authentication of a transcript which is already on file with a federal court, and, however they may describe it, they request the disclosure of Dorfman information which is not now in the public domain.

**26.** As indicated, defendants argue that the Dorfman wiretap would help to prove the truthfulness of Drinkhall's statement that Kramer was spreading rumors that an organized crime figure had been overheard speaking favorably about Drinkhall. Similarly convoluted bases of relevance are adduced with respect to the Blasko tap. Memorandum of Law at 22–23. The Department claims that its officials have reviewed the transcripts and have concluded that they have no relevance. That finding is not conclusive on the Court, but it does lend support to what appears to be fairly obvious in any event.

**27.** Should these tribunals decide to release the documents, the Court will then rule on their admissibility here (in terms of relevance, materiality, and the like) at the trial.

### E. Probation and Prison Records

Defendants request the production of all Department of Justice files relating to Calabrese,[28] and all records of the Bureau of Prisons that identify and relate to inmates present at the McNeil prison visiting room on February 25, 1979. In response to that request, the Department has stated that it is willing to disclose the bulk of the Calabrese and the Bureau of Prisons records,[29] and the dispute between the parties in this category, at least, has been substantially narrowed.

According to the Department, it has searched for, and is prepared to release pursuant to court order, all prison records for Calabrese for 1978 and 1979 and any record of communications relating to Calabrese between Kramer, Dowd, or any other member of the Organized Crime and Racketeering Section with the Bureau of Prisons, with the exception of several words from one of the documents and an institutional memorandum containing an informant's name. Defendants continue to insist that the redactions are improper. Rather than to attempt to penetrate the maze of the parties' allegations and counter-allegations with regard to these few deletions in the abstract, the Court will require the Department to submit the two documents at issue for an *in camera* inspection. That procedure would be more likely to lead to accurate and just results in

### F. Informant Data

Defendants have requested access to documents and testimony relating to three persons the Department of Justice originally claimed were informants: James Malloy, Randy Munson, and Jim Drinkhall. Subsequently, the Department stated that it was waiving its privilege with regard to Malloy. As concerns Munson and Drinkhall, the Department states in its latest papers only that the FBI was "continuing to search for any additional documents relating to these individuals on an expedited basis." Reply of Department of Justice at 11.

 The purpose of the informants' privilege is to protect the flow of information to the government. *Westinghouse Electric Corp. v. Burlington, Vt.*, 351 F.2d 762, 768 (D.C.Cir.1965).[31] That privilege, however, is not absolute, but courts must weigh it against the significance of the information sought and the overall importance of the litigation. *Id.* at 771. Moreover, the privilege protects the identity of individuals only when that identity is unknown. *Id.* at 769 n. 11.

 Here, the defendants know about Malloy and, of course, they know about

less time than the alternative of a ruling based on the parties' wide-ranging arguments.[30]

---

**28.** Among the Department of Justice records being sought are the presentence reports relating to Calabrese. These records, as the Department correctly observes, are basically under the control of the respective District Courts, not that of the Department. The issues surrounding the presentence reports are discussed in Part V *infra*.

**29.** The Department does state, rather obscurely, that since these records are "arguably subject to the provisions of the Privacy Act, [it] seeks an order from this Court before disclosing any such documents." Points and Authorities at 20. It seems clear that defendants are entitled to such materials as the names of prisoners present in the visiting room notwithstanding the Privacy Act. 5 U.S.C. § 552a(b)(11). Moreover, no objections have been received from Calabrese or anyone else to such disclosure and the Court will order the release of all the documents

(except for those discussed in the text of this part of the Opinion).

**30.** Defendants express doubt that the Department has complied with their request for all the documents relating to Calabrese that were withheld pursuant to the Privacy Act. Supplemental Memorandum at 16–17. The Department has responded that it has, in fact, itemized the documents responsive to the subpoena. Department of Justice Reply at 9. In the absence of some showing that the Department has misrepresented its compliance, the Court will accept that response. See *Weisberg v. CIA*, 705 F.2d 1344, 1351 (D.C.Cir.1983).

**31.** As the court said in that case, the assumption is that a citizen, recognizing the risk of retaliation, will be more likely to provide information and if he knows that his identity will be kept secret.

Drinkhall.[32] As for the *Westinghouse* factors, information concerning Kramer's relationship with Malloy and Sheehan's relationship with Drinkhall may be material and significant in the context of this litigation.[33] Moreover, this litigation is important in a financial, legal, and public-interest sense.

As against all of that, the Department of Justice has provided only cryptic arguments, suggesting on the one hand that it is relying on the privilege (without giving any particulars) and on the other that it is searching its files for relevant information.

The Department has made an insufficient showing, and the Court will require it to turn over to defendants the documents relating to Malloy, Munson, and Drinkhall.[34]

### G. *FBI and Utah Trial Documents*

Somewhat late in the discovery process, defendants requested FBI reports on the investigations of Calabrese and Drinkhall and the files of the Utah trial. The Department responded by releasing over 400 pages of documents from the FBI files and all the public materials from the Utah trial file. The Department opposed defendants' request for an index of the remainder under *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir.1973), contending that the preparation of such an index would be unduly burdensome within the meaning of Rule 26(c), Fed.R.Civ.P., inasmuch as the FBI files consist of some 15,000 pages of materials and the Utah file of some eleven boxes of materials. The Court agrees with the Department.

■■■ Notwithstanding defendants' usual claim that the documents sought are crucial to their case (see note 17 *supra*), it appears that these particular materials are likely to be only of marginal relevance.

The Department has asserted that a thorough search was conducted and that all documents which appeared to be relevant were produced. To be sure, as defendants point out, they or their counsel might be able to discover some additional documents which may be relevant or lead to the discovery of relevant evidence if they were armed with a comprehensive and detailed *Vaughn* index. But a balance must be struck, as in many other discovery disputes, between the possibility of the production of useful evidence and the burden on the party in the possession of the materials. The Court concludes that, in this instance, the burden on the Department would be such that Rule 26(c) tips the balance in its favor. The Department's request for a protective order will be granted.

### II

### *Material from Internal Revenue Service*

Defendants have asked the Internal Revenue Service to produce all communications with it by Kramer, Dowd, or any other employee of the Department of Justice that refer in any way to A.M.I. Inc., Al Marchini, Samuel Calabrese, or Charles Calabrese. It is claimed that such documents might substantiate allegations in Drinkhall's second article to the effect that Kramer tried to pressure Calabrese by referring information about Calabrese's interest in A.M.I. to the IRS and that the IRS began an audit of Marchini after his acquittal. The IRS has moved for a protective order, relying on 26 U.S.C. § 6103.

■■■ Section 6103(a) provides that tax returns and return information shall be confidential and that, with certain exception, it shall not be disclosed by any officer

---

**32.** Difficult as that may be to believe, the Department of Justice seeks to withhold from Drinkhall and the other defendants documents identifying Drinkhall as an individual who provided the Department with information. Compare Kafka, *The Trial* (1925). Drinkhall has waived any privilege.

**33.** The Malloy information may prove that Kramer alleged the receipt by Drinkhall of a bribe and the Drinkhall information that Sheehan provided Drinkhall with data suggesting a scheme to force Calabrese to testify.

**34.** To the extent that documents may reveal the identity of other informants, the names may be redacted.

or employee of the United States. The term "return information" is broad and includes any information gathered by the IRS with regard to a taxpayer's liability under the Internal Revenue Code. See *Chamberlain v. Kurtz*, 589 F.2d 827 (5th Cir.1979).

Defendants do not seriously quarrel with these principles. Instead, they claim that the rule of secrecy imposed by section 6103 does not negate the "residual power" of the courts to order disclosure of tax return information. However, except for the *McSurely* case, discussed *infra*, no authority is cited in support of the existence of a disclosure authority independent of section 6103. On the other hand, there are a number of decisions, exemplified by *Garity v. United States*, 46 A.F.T.R.2d ¶ 80–5062 at 5147–48 (E.D.Mich.1980), which hold that tax returns and return information are subject to discovery only if the disclosures are permissible under section 6103. See also, *American Friends v. Webster*, 720 F.2d 29 (D.C.Cir.1983) (section 6103 "comprehensively regulates the use and dissemination of tax returns and return information").

Defendants rely to the contrary exclusively upon *McSurely v. McAdams*, 502 F.Supp. 52 (D.D.C.1980). That case involved claims of massive violations by various high officials, including the chairman of a powerful committee of the U.S. Senate, of the plaintiffs' constitutional and other rights through an extraordinary conspiracy involving intimidation, harassment, and an illegal search of their home. See *McSurely v. McClellan*, 553 F.2d 1277 (D.C.Cir.1976). It is in that peculiar context that the District Court allowed limited discovery of tax return information. Not only, however, has recent Supreme Court precedent cast some doubt upon the *McSurely* doctrine, but this case is not comparable to *McSurely* either on the facts or on the need for disclosure.

In *Baldrige v. Shapiro*, 455 U.S. 345, 102 S.Ct. 1103, 71 L.Ed.2d 199 (1982), the Supreme Court held that communities concerned about the accuracy of the census were not entitled, in discovery, to disclosure of raw census data because the confidentiality provisions of the Census Act, 13 U.S.C. §§ 8, 9, prohibit the disclosure of such data. In support of its holding, the Court relied extensively on the relationship between confidentiality and voluntary compliance with the effects of the census-takers. The rationale of that case is directly applicable here. Voluntary compliance lies at the heart of the nation's tax collection scheme just as it is central to the collection of census data. See, *e.g.*, 122 Cong.Rec. 23,995 (1976). Indeed, because by and large tax information is far more sensitive than that accumulated by the census takers, there is an even greater public interest in confidentiality.[35]

 In any event, this case is unlike *McSurely*. The crux of the McSurelys' claim to the tax information was that that plaintiffs were seeking to learn of the extent to which their own, illegally seized, documents were disseminated throughout the IRS, and the manner in which these documents were being used by IRS officials. Even so, the court required the plaintiffs to show that their close affiliation with third party taxpayers made it likely that their own tax information would be located in the IRS files. Defendants cannot hoist themselves into the *McSurely* category simply by incantation of the claim of potential misconduct of Kramer and Dowd. If there was misconduct, it was committed by relatively low level employees not having power over the IRS; it did not rise qualitatively to the magnitude of that involved in *McSurely;* and it involved the IRS only in a tangential and collateral way. Defendants are not entitled, on the basis of that claim alone (compare Part I–A *supra*), to extraordinary relief apart from section 6103 merely because the plaintiffs may

---

**35.** Defendants' attempt to contrast this case with *Baldrige* on the ground that "there is a long tradition of secrecy of census data, unlike the tradition of court-ordered disclosure of tax information" (Supplemental Memorandum at 28 n. *) is absurd. The alleged tradition consists exclusively of the decision of the District Court in the *McSurely* case.

have referred to the IRS in connection with their alleged pressure on Calabrese. The IRS request for a protective order will be granted.

## III

### Deposition of Counsel for Defendants

Plaintiffs have moved to compel Robert D. Sack, an attorney for defendants, to submit to a deposition. Sack is a member of the firm of Patterson, Belknap, Webb & Tyler, who is a libel counsel for Dow Jones & Co. He was involved in the preliminary stages of this controversy but has not appeared on behalf of defendants since suit was instituted.

It appears that shortly after the publication of the first article by Drinkhall, Kramer wrote to Laurence G. O'Donnell, managing editor of the *Wall Street Journal* and a defendant in this action, complaining of alleged misquotes and other inaccuracies. O'Donnell responded on May 8, 1979, stating that the article was accurate, that Kramer had admitted to improper tactics against Calabrese, and that there were sources for the allegation that Calabrese had been beaten in prison as a result of false information disseminated by Kramer. O'Donnell was deposed by plaintiffs and he testified that the factual information in his May 8, 1979 letter had come from Sack. In June 1982, plaintiffs noticed Sack's deposition, defendants refused to produce him, contending that any testimony he might give would be either privileged or irrelevant, and the motion to compel followed.

 Plaintiffs correctly state that an attorney for a party is not immune from discovery. See 4A J. Moore, *Federal Practice* § 30.51 at 30–43 (1982); *In re Penn Central Litigation*, 61 F.R.D. 453, 463 (S.D.N.Y.1973); *In re Arthur Treacher's*

*Franchisee Litigation*, 92 F.R.D. 429, 437 (E.D.Pa.1981). It is also true that the attorney-client privilege is waived when the communication is intended to be made public. *United States v. Am. Tel. & Tel.*, *supra*, 86 F.R.D. at 614 n. 3. But there are insuperable problems to the use plaintiffs would make of these general principles in this controversy.

 It is undisputed that Drinkhall's conversations with Sack—which form the basis of the May 8, 1979 letter—were held in order to enable the latter to advise the *Wall Street Journal* about the legal issues raised by the article. Sack did, in fact use the information from Drinkhall to draft O'Donnell's letter to Kramer, a letter which is, in essence, a rejoinder to Kramer's charges similar to an answer to the complaint. It is apparent both from the letter and the context that Sack was not a mere conduit for transmission to others [36] but that, both in gathering information from Drinkhall and in preparing the letter for O'Donnell, he was acting in his capacity as an attorney and legal advisor. As *Upjohn v. United States*, 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981) teaches, statements obtained in the course of a factual investigation undertaken preliminary to the resolution of a legal problem are privileged,[37] and the privilege is not forfeited merely because the information is subsequently disclosed in the course of counsel's representational duties.[38]

 Plaintiffs' waiver theory fails for yet another reason. Counsel for the parties stipulated in the course of the O'Donnell deposition that testimony by the witness would not be deemed to constitute any waiver of the attorney-client or work product privileges. In view of that stipulation,

---

**36.** *United States v. Tellier*, 255 F.2d 441 (2nd Cir.1958); *United States v. Shibley*, 112 F.Supp. 734 (S.D.Calif.1953).

**37.** Affidavits are on file stating that both Drinkhall and Sack expected the communications between them to remain confidential.

**38.** The communications between Sack and the Dow Jones witnesses are protected not only by the attorney-client privilege but also by the work product privilege. See *Upjohn v. United States, supra,* 449 U.S. at 399–402, 101 S.Ct. at 687–688. Plaintiffs have wholly failed to meet *Upjohn*'s standard of a "strong[ ] showing of necessity."

plaintiffs cannot now rely on the O'Donnell deposition to support a claim of waiver.

The motion will be denied.[39]

## IV

*Plaintiffs' Motion to Compel Production of Documents*

Plaintiffs have moved to compel defendants to comply with a request for the production of a number of documents.[40]

■ Two of the requests demand the production of all documents received from third parties "referring to or pertaining to sources" for the Drinkhall articles and all documents "reciting or pertaining to information received from third parties pertaining to sources" for these articles. These requests are made against a history of production by the defendants, according to their submission, of all of Drinkhall's files relating to the disputed articles, over 10,-000 pages of materials kept by Drinkhall relating to other subject matters and articles, and great numbers of documents (including drafts, travel vouchers, petty cash slips, credits and receipts, and phone records) in Dow Jones' files relating to Drinkhall or the articles. Drinkhall and Dow Jones claim to have "produced nearly everything they have, other than documents protected" by various privileges.[41]

Moreover, and perhaps more significantly, the requests on their face include documents that are protected by the attorney-client and work product privileges,[42] and they were filed at a time when the motion to compel disclosure of Drinkhall's confidential sources was pending before the Court. The Court has some problem discerning the theory underlying a request for "source" material with the case in that posture. The requests are overbroad, oppressive, confusing, they demand privileged documents, and they will be denied.

The final request is for the production of "any and all documents created since June 1, 1981, which pertain to Jim Drinkhall, his employment status and assignments at the *Wall Street Journal.*" In their Memorandum of Points and Authorities, plaintiffs limit this request by stating that

it is obvious that this request calls for material which is relevant to the subject matter of this lawsuit and/or is calculated to lead to admissible evidence ...," [43]

and they provide some specific "examples" of the kinds of documents they wish to discover. With respect to these examples, defendants have replied with equal specificity that no such documents exist. To the extent that the request covers materials not encompassed by those examples, defendants claim overbreadth, dubious relevance,[44] and invasion of a claimed news-gathering privilege. Here again, particularly in view of the discovery that has already occurred, defendants' objection to this overbroad and diffuse request is well taken. It is obviously not up to defendants to search their post-1981 files for Drinkhall material that "is relevant ... or is calculated to lead to admissible evidence," particularly since there probably would be a substantial difference of views as to what would properly be includable in that category.

The motion to compel will be denied.[45]

---

**39.** Since all of the information sought by plaintiffs from Sack is privileged (except to the extent that it may be irrelevant) there is no need to require Sack to attend the deposition and to assert the privilege there in response to specific questions. Fed.R.Civ.P. 26(c); *Walker v. United Parcel Services,* 87 F.R.D. 360 (E.D.Pa.1980).

**40.** Five requests for documents were originally at issue, but defendants subsequently complied with two of these.

**41.** Defendants' Memorandum at 2.

**42.** While the requests are not particularly clear, they would seem to encompass material that may well be entirely irrelevant.

**43.** Memorandum at 4.

**44.** The request deals with events three years after the publication of the articles at issue here.

**45.** Plaintiffs also request costs and attorneys' fees. In view of the Court's disposition of the motion, the request will likewise be denied.

## V

### *Probation Officers*

Plaintiff Kramer has moved for an order granting leave to take the depositions of two U.S. Probation Officers and permitting access to the presentence reports of Calabrese. The defendants likewise request these presentence reports.

As indicated (note 2 *supra*), Calabrese was several times convicted and sentenced in federal courts during the 1976–78 period. Among the claims made in this litigation is a counterclaim by Calabrese which asserts that the criminal prosecutions and other events which followed were the product of an unlawful conspiracy between Kramer and other members of his Justice Department unit.

■ Kramer, as well as the defendants, seek access to Calabrese's presentence reports prepared by the probation officers in the District Courts in Virginia and Utah and other documents in the possession of these officers concerning Calabrese. Kramer also requests leave to take the deposition of these officers. As all the parties recognize, the documents being sought are normally regarded as confidential, and the probation officers would be prohibited by the court to which they are assigned from attending a deposition to testify concerning the discharge of their official responsibilities. See United States Probation Manual, ch. 3 § 3004 (1978). However, it is also clear that this rule of confidentiality may be overcome in appropriate circumstances.

■ The Supreme Court held in *Douglas Oil Co. v. Petrol Stops Northwest, supra*, that the secrecy of grand jury records may be breached when (1) the records are needed to avoid a possible injustice in another judicial proceeding; (2) the need for disclosure is greater than the necessity for continued secrecy; and (3) the request is so structured as to cover only

needed materials. These tests are met here.[46]

First. If Calabrese believed that he had been and was being abused, he would in all likelihood have reported this abuse to the probation officers. If he did voice such complaints and they were recorded, this would, of course, tend to support his present counterclaim. If he did not make complaints, or made complaints which are inconsistent with his present position, that, too, would be relevant to the present litigation.[47]

Second. The interest in favor of disclosure strongly outweighs the need for secrecy. That need is obviously not as great in the probation officer context as it is in the context of grand jury proceedings, particularly since no criminal proceedings are now pending anywhere which could be affected by the disclosures presently being sought. There is, on the other hand, a strong public interest in a full airing of the subject of Calabrese's counterclaim. Calabrese alleges a gross corruption of the judicial process by a Department of Justice lawyer in two federal jurisdictions, and his allegations center within the functioning of that process. These issues should be ventilated with as little in the way of artificial impediments as possible. Insofar as Calabrese's own rights are concerned, he has not filed any opposition to the request.

Third. The request is narrow, involving only Calabrese. Indeed, plaintiff has stated that no inquiry would be made into such subjects as Calabrese's personal history and background, his family or his associates. The inquiry, both oral and written, would be limited to matters bearing directly upon the specific allegations contained in the counterclaim.

It seems plain, for these reasons, that, at least preliminarily (see *infra*), a strong case has been made for the release of the materials and the testimony of the proba-

---

**46.** If grand jury materials may be released upon this kind of a showing, *a fortiori* this is true of probation officers' reports and testimony.

**47.** Plaintiffs claim that Calabrese wrote to and told one of the probation officers that he had not been attacked while in prison. Plaintiffs' Second Reply at 4.

tion officers. It remains to be determined how the relief sought by plaintiff and the defendants may be accomplished, bearing in mind the interests of the District Courts in Virginia and Utah in this matter.

■ The procedure to be followed will approximate that discussed in Part I–C *supra.* The Court will grant preliminary leave to proceed with the requested discovery, subject to a final decision following the receipt of the views of the U.S. District Court for the Eastern District of Virginia and the U.S. District Court for the District of Utah with respect to the need, if any, for continued confidentiality within their jurisdictions.[48] Once those views have been received, the Court will make a final ruling on the requests.[49]

## VI

### *Motion for Reconsideration*

Plaintiffs have moved for reconsideration of the Court's decision of October 26, 1983, on the confidentiality of Drinkhall's sources. Although there have been some changes in emphasis, nothing new has been offered. Plaintiffs' arguments are based essentially on the proposition that the "privilege must give way" because Drinkhall's credibility has been irretrievably undermined. Motion for Reconsideration at 6. The Court has no intention of thus prejudging the case in advance of trial.

■ Defendants have not moved for reconsideration, but they suggest that the Court is unfairly burdening them by not permitting them to rely on Drinkhall's undisclosed sources. In that regard, defendants contend that the Court could not preclude their reliance on the confidential source privilege unless it first found that the privilege was overcome. As the Court previously indicated, plaintiffs have made at least a threshold showing that Drinkhall fabricated the existence of some of his sources and their evidence. That conclusion was not a sufficient basis, in the Court's view, to defeat the privilege altogether; it was adequate, however, to prevent defendants from "having it both ways"—to refuse to divulge the identity of the sources but to rely on them at trial and to argue now that plaintiffs' evidence is sufficient and at the trial that it is not. That is still the Court's opinion.[50] Plaintiffs' motion for reconsideration will be denied.

## ORDER

The Court has considered defendants' motion to compel the production of documents from the Department of Justice and the Internal Revenue Service, the Department of Justice's motion for a protective order, the Internal Revenue Service's motion for a protective order, plaintiffs' motion to compel the deposition of Robert D. Sack, plaintiffs' motion to compel the production of documents, plaintiff William M. Kramer's motion for an order to permit the depositions of United States Probation Officers Thomas Rockhold and M.L. Haun and to permit access to documents in their possession, and plaintiffs' motion for reconsideration, the oppositions, objections, re-

48. According to the Department of Justice, both courts are likely to agree to the appearance of the probation officers for depositions and the release of the documents now that Calabrese has had an opportunity to oppose the request.

49. Defendants further request that when the two probation officers are deposed, they be required to testify also about communications with Kramer, Dowd, and other Department of Justice employees concerning the sentencing and treatment of Calabrese. Inquiries regarding communications with Kramer and Dowd would be appropriate; questions regarding communications with other Department of Justice employees would not be.

50. Similarly unimpressive is defendants' argument that it is unfair to prohibit reliance on the sources by defendants other than Drinkhall. All the defendants are, of course, enjoying the benefits of the privilege since there will be a single trial. Defendants' complaint rings particularly hollow in view of their persistent refusal to accept plaintiffs' proffered "compromise"—that the *Wall Street Journal* confront Drinkhall's alleged sources in absolute secrecy to inquire whether they did, in fact, tell Drinkhall what he claims they said.

plies, supplemental memoranda, and other briefs, affidavits, and the entire record herein, and in accordance with a Memorandum issued this date, it is this 26th day of January, 1984, ORDERED, as follows:

1. Defendants' motion to compel the production of documents from the Department of Justice and the Department's motion for a protective order are granted in part and denied in part as follows:

 a. the Department of Justice shall produce to defendants the three prosecution memoranda prepared by plaintiffs Kramer and Dowd (documents nos. A–2, A–3, and A–4);

 b. the Department of Justice shall submit to the Court for *in camera* inspection within fifteen days hereof the memoranda prepared by Kramer to his superiors in the Department of Justice in which he reacts to charges against him, and the transcripts of the interviews of Kramer and Dowd by a Department of Justice investigator (documents nos. A–8, A–9, and A–10);

 c. the Department of Justice need not produce the last section of the Hantman Report, containing conclusions and recommendations (document no. A–1);

 d. the Department of Justice need not produce the grand jury transcripts and other grand jury materials;

 e. the Department of Justice need not produce the requested wiretap information but application therefor may be made to the U.S. District Courts which originally authorized surveillance;

 f. the Department of Justice shall produce its files relating to communications between Kramer, Dowd, or any other member of the Organized Crime and Racketeering section and Calabrese, Calabrese's prison records (all documents indexed in Attachment B of Department of Justice's Memorandum of Points and Authorities, with the exception of documents nos. B–13, B–38(j), B–74, and B–114), and the records of the U.S. Bureau of Prisons relating to the presence of inmates in the McNeil prison visiting room on February 25, 1979;

 g. the Department of Justice shall submit to the court for *in camera* inspection within fifteen days hereof documents nos. B–13 and B–114;

 h. the Department of Justice shall produce all documents and testimony relating to the informants Mally, Munson, and Drinkhall, except that the names of other informants may be redacted; and

 i. the Department of Justice need not produce FBI reports on the investigations of Drinkhall and Calabrese and the files of the Utah trial.

2. The motion of the Internal Revenue Service for a protective order is granted.

3. Plaintiffs' motion to compel Robert D. Sack to submit to a deposition is denied.

4. Plaintiffs' motion to comply with the request for production of documents and for costs and attorneys' fees are denied.

5. The motion of plaintiff Kramer and that of the defendants for access to the presentence reports of Samuel Calabrese and for leave to take the depositions of Thomas Rockhold and M.L. Haun, U.S. Probation Officers, will be granted if no objection is interposed by the U.S. District Court for the Eastern District of Virginia and the U.S. District Court for the District of Utah.

6. Plaintiffs' motion for reconsideration of the Court's decision of October 26, 1983, is denied.

7. There will be a status call on February 2, 1984, at 10:00 a.m. in Courtroom No. 1. The parties shall be prepared to discuss further proceedings in these cases and the setting of a trial date in April or May 1984.