UNITED STATES of America, Plaintiff,

v.

BOARD OF EDUCATION OF the CITY OF CHICAGO, Defendant.

No. 80 C 5124.

United States District Court, N.D. Illinois, E.D.

May 23, 1985.

Margaret Gordon, Asst. U.S. Atty., Chicago, Ill., for plaintiff.

Robert C. Howard, Hartunian, Futterman & Howard, Hugh R. McCombs, Isham, Lincoln & Beale, Chicago, Ill., for defendant.

## MEMORANDUM ORDER

ASPEN, District Judge:

This case is on remand from the decision of the Court of Appeals last year ordering this Court to determine "whether the Board is receiving the maximum level of funding that is available under the criteria of programs through which funds for desegregation can be disbursed." *United States v. Bd. of Education of the City of Chicago*, 744 F.2d 1300, 1306 (7th Cir.1984) (*"Board II"*), *cert. denied*, —— U.S. ——, 105 S.Ct. 2358, 86 L.Ed.2d 259 (1985). The mandate entails, among other things, a thorough review of how the Secretary exercised his discretion in allocating funds already appropriated by Congress for school desegregation. The parties have engaged in intensive discovery in preparing for the Court's initial decision on remand concerning the Secretary's allocation of funds for Fiscal Year ("FY") 1984. The Secretary has refused to produce twenty-seven documents sought by the Board, asserting the deliberative-process privilege as to all of them and the attorney-client privilege and the work-product immunity as to two of them. The Board has moved to compel production. For the reasons stated below, we order the Secretary to produce all of the documents to the Court for an *in camera* inspection, after which we will rule on the availability of each document.

1. *The Deliberative-Process Privilege*

The Secretary relies mostly on the deliberative-process privilege in withholding the documents, so we will focus on that privilege first. Sometimes called the "predecisional privilege," it is unique to government and serves to protect the quality of the flow of ideas within a government agency. *See, e.g., Coastal States Gas Corp. v. Dept. of Energy*, 617 F.2d 854, 866

(D.C.Cir.1980). The privilege extends only to communications which are *predecisional*, that is, generated before the adoption of agency policy, and *deliberative*, that is, reflecting the give-and-take of the consultative process.[1] *Id.; see also Resident Advisory Board v. Rizzo*, 97 F.R.D. 749, 751 (E.D.Pa.1983). Communications made after the decision and designed to explain it are not privileged. *Rizzo*, 97 F.R.D. at 751. When the privilege does apply, it is qualified rather than absolute and "can be overcome if the party seeking discovery shows sufficient need for the otherwise privileged material." *Id.* at 752. And since the benefits are " 'at best indirect and speculative,' [the privilege] must be strictly confined 'within the narrowest possible limits consistent with the logic of [its] principles.' " *Id., quoting In re Grand Jury Proceedings*, 599 F.2d 1224, 1235 (3d Cir.1979).

■ These abstract principles are easier to state than apply. Courts have created a formalistic two-step procedure in deciding whether to apply the privilege. The first step is a threshold one. The Court must first decide whether the government has shown that the privilege can apply at all. If so, the Court engages in the process noted above of balancing the litigant's need for disclosure against the government's need for secrecy. The first step in turn entails three requirements: (1) There must be a formal claim by the department head with control over the matter, after personal consideration of the problem; (2) the responsible official must demonstrate by affidavit precise and certain reasons for preserving the confidentiality of the documents in question; (3) the documents must be specifically identified and described. *See Rizzo*, 97 F.R.D. at 752–53. Although not doing so when he first claimed the privilege, the Secretary himself has now formally invoked the privilege by an affidavit which states that he has personally considered the problem. Thus, the first part of the threshold step is met. The parties dispute whether the Secretary has satisfied the second and third parts.

■ The Secretary has asserted the privilege with respect to twenty-seven documents. He has withheld more than three-fourths of these, twenty-one, from the Board, and has given the Board redacted copies of the other six. In his affidavit, the Secretary has briefly stated in conclusory terms that all of these documents are predecisional and deliberative.[2] An attach-

---

1. There are several corollaries to these two elements. The privilege does not extend to factual or objective material outside of the deliberative process or severable from otherwise privileged documents. *See EPA v. Mink,* 410 U.S. 73, 87–88, 93 S.Ct. 827, 836, 35 L.Ed.2d 119 (1977). Even a predecisional, deliberative document sheds the privilege if adopted as the agency position on an issue or if used in dealings with the public. *See Coastal States,* 617 F.2d at 866.

2. His affidavit essentially sketches the elements of the privilege in one paragraph, and then makes a policy pitch in a different paragraph:

 4) The documents and conversations described in the Attachment consist of deliberative material, including communications between and among officials of the Executive Branch, including former Secretary Bell, members of Department staff and staff of other Executive agencies. These communications consist of predecisional opinions and recommendations of Department staff concerning positions to be taken by the Department on the use of FY 1985 funds to support FY 1984 programs; namely, the Secretary's Discretionary Fund, title IV of the Civil Rights Act of 1964 (Title IV), Follow Through, Women's Educational Equity Act, Territorial Teacher Training and General Assistance to the Virgin Islands.

 5) An essential requirement of the policy-making process is the assurance that the Secretary and his staff are able to engage in free and candid exchange of views and deliberations in considering the effect of legislative action on the functioning of the Department and the appropriate response of the Executive Branch to proposed legislation. Clearly, such exchange of information would be severely restricted and likely lacking in any constructive value if its contents were subject to public or judicial scrutiny, whether during or after the policy-making process had occurred. The knowledge that their deliberations and recommendations may be scrutinized by persons having differing interests to those of the Department of Education would create an inhibiting atmosphere for the Secretary's advisers, unconducive to the formulation of sound policy.

ment to the affidavit identifies and briefly describes each of the documents.[3] Although brief and conclusory, the Secretary's showing has met the threshold step of asserting the privilege. While the Court is sensitive to the Board's concerns that the Secretary's affidavit is brief and argumentative rather than factual, it is equally sensitive to the reality that it is hard to be very specific without violating the confidences the deliberative process privilege is meant to protect. *Cf. Antonelli v. Federal Bureau of Investigation*, 721 F.2d 615, 617 (7th Cir.1983) (FOIA context), *cert. denied*, — U.S. —, 104 S.Ct. 2399, 81 L.Ed.2d 355 (1984). But the Secretary's mere assertion of the privilege does not necessarily mean he can withhold all or even any of the documents. As noted above, we must balance the Secretary's need for confidentiality against the Board's need for disclosure. In so doing, we will not rely on mere conclusory assertions. We will balance the interests after reviewing the documents *in camera*, so that we can make an informed analysis.

■ An *in camera* inspection may properly be used to decide whether a par-

ty's claim of litigative need outweighs the government's interest in confidentiality. *See In re Agent Orange Product Liability Litigation*, 97 F.R.D. 427, 434 (S.D.N.Y. 1983). Though not automatic, such an inspection has grown more common. *Id.* And *in camera* inspection has been used when the private party makes a showing of relevancy, which is "the preliminary showing of necessity which permits at least an *in camera* review." *McClelland v. Andrus*, 606 F.2d 1278, 1290 (D.C.Cir.1979).

■ The Board has made this preliminary showing of necessity warranting *in camera* review. Indeed, although we of course express no firm opinion without first seeing the documents, we venture to say that the Board will probably be able to make a very powerful showing of necessity.[4] It is hard to imagine a case in which the government's deliberative process is more relevant or crucial. At dispute is whether the Secretary has violated "a unique funding provision in a consent decree that constitutes an unprecedented settlement of a school desegregation claim by

3. For example, one typical document is identified and described as follows:

> Memorandum dated 2/21/84 from Frank B. Withrow, Director, DTRAD, to Donald J. Senese, Assistant Secretary, Office of Educational Research and Improvement (OERI), recommending the funding slate for FY 1984 Teacher Incentive grants. (This document reflects the recommended figures for awards to the grantees listed under Teacher Incentives Grants in the "Secretary's Discretionary Fund FY 1984 Report," already provided to the Board at this deposition.)

4. Relevance is one important factor to consider in a showing of necessity. Others include the existence of alternate means of proof and the presence of allegations of governmental misconduct. *See Dowd v. Calabrese*, 101 F.R.D. 427, 431 (D.D.C.1984). The *Dowd* court held that documents of "the highest relevance" constituted "a concrete and particularized basis for disclosure which far outweighs the government's generalized interest in the confidentiality of its deliberations." 101 F.R.D. at 431. As we note in the text, the documents are probably of "the highest relevance" in this case. Moreover, the allegations of violations of the consent decree are not unlike allegations of governmental misconduct. Indeed, this case has been laced with allegations of bad faith on the part of the

government. While the Seventh Circuit reversed many of Judge Shadur's findings of bad faith, *see Board II*, 744 F.2d at 1307, it did not reverse all of them. *Id.* at 1307–08 (overturning district court's remedy, but not reversing the findings of bad faith upon which remedy was based). Although the legislative activities which generated this finding of bad faith are tangential to the funding issues now before us, we cannot be blind to the government's previous attempts in this case to impair the consent decree. As the Seventh Circuit said:

> In the circumstances of this case, we deem it important to note that the actions of the Executive Branch described above and reflected in the hearings below could be interpreted to contravene the spirit of the Decree. Such actions, while perhaps within constitutional limits, cannot enhance the respect to which this Decree is entitled and do not befit a signatory of the stature of the United States Department of Justice. The Executive Branch initiated this critical litigation and bears a continuing shared and special responsibility for its eventual outcome, regardless of changes in personnel and ideology that will inevitably accompany the passage of time. *Id.* at 1308.

the United States." *Board II*, 744 F.2d at 1304. We remind the Secretary that this consent decree imposes " 'a substantial obligation on the government to provide available funds to the Board.' " *Id., quoting, Board I*, 717 F.2d 378, 383 (7th Cir.1983). The government conceded at oral argument in *Board II* that in fulfilling the consent decree it was going to give the Board "top of the list priority" for desegregation assistance. *Id.* at 1305. The government also has conceded that the consent decree "binds the Secretary of Education's discretion with respect to the funds that may be used for school desegregation pursuant to congressional appropriation, and [it] conceded that a district court may review the Secretary's exercise of discretion in distributing those funds to the board." *Id.* at 1306 n. 7. Clearly, then, this is not the usual "deliberative process" case in which a private party challenges governmental action or seeks documents via the Freedom of Information Act, and the government tries to prevent its decisionmaking process from being swept up unnecessarily into public. Here, the decisionmaking process is not "swept up into" the case, it *is* the case. The issue here *is* the deliberative process, and that issue has been defined in part *by* the United States and the Seventh Circuit. The United States has *voluntarily* bound itself to a consent decree under which it has made a great commitment to the Board; the Board alleges that the United States has violated its commitment; the government has conceded that its decisionmaking process is relevant to this Court's decision on whether the consent decree was violated; and, finally, the Court of Appeals has remanded this case for "a determination of whether the Board is receiving the maximum level of funding," that is, an inquiry into the decisionmaking process. Thus, the Secretary's assertion of the privi-

lege, if sustained, could have the harmful effect of preventing this Court from fulfilling its very mission on remand and depriving the Board of a full hearing on its case.[5]

We reject the Secretary's argument that the documents are not relevant. The Secretary claims that it has already produced documents and information concerning the funding decisions he *actually made*. The documents withheld are merely "pre-decisional documents containing recommendations, advice, and opinions that were *not* adopted by the Secretary." United States Memorandum in Opposition to the Chicago Board of Education's Motion to Compel at 2 (emphasis in original). While we agree that this description of the documents, if true, brings them within the privilege for purposes of balancing, that does not make them irrelevant to this proceeding. The nature of this unique case is such that the "roads not taken" are as relevant as those taken. The recommendations rejected and options considered are exactly what the Court needs to consider to fulfill its mandate of deciding whether the Secretary actually gave the Board "top of the list priority." Likewise, we agree with the Board that a decision to fund one program could be tantamount to a decision not to fund the Board. This obviously bears on whether the Secretary violated his obligations under the consent decree.

### 2. Attorney-Client Privilege and Work-Product Immunity

The Secretary also asserts the attorney-client privilege and work-product immunity with respect to two of the twenty-seven documents.[6] As with the other documents, we will rule on these issues following an *in camera* inspection.

The work-product immunity is qualified, like the deliberative-process privi-

---

5. Of course, upon receiving the documents, the Court will give due weight to the concerns of confidentiality which underlie the privilege. However, in this special case the documents will likely prove to be centrally relevant. If so, it is unlikely that the need for secrecy will outweigh the Board's need for the documents.

6. One is a memorandum from General Counsel to former Secretary Bell, which, according to the Secretary, gives legal advice on policy issues relating to the interim release of FY 1984 funds. The second is another memorandum from Counsel to Mr. Bell, giving legal and budgetary advice on funding Education Technology projects in FY 1984.

lege; it protects documents prepared by counsel in anticipation of litigation. *See, e.g.,* Fed.R.Civ.P. 26(b)(3). A showing of substantial need may overcome the immunity. *Rizzo,* 97 F.R.D. at 752. The balancing test is similar to the one done for the deliberative process privilege, *id.,* and we will do the appropriate weighing when we receive the documents *in camera.* One significant additional question we must consider in this weighing process, of course, will be the extent to which the memoranda contain "the mental impressions, conclusions, opinions or legal theories of an attorney." Fed.R.Civ.P. 26(b)(3). Such "mental impression" work product is "nearly absolute ... and can be discovered only in very rare and extraordinary circumstances." *In re Murphy,* 560 F.2d 326, 336 (8th Cir.1977); *see also Duplan Corp. v. Moulinage et Retordie de Chavanoz,* 509 F.2d 730, 734 (4th Cir.1974) (opinion work product is absolutely immune), *cert. denied,* 420 U.S. 997, 95 S.Ct. 1438, 43 L.Ed.2d 680 (1975).

 The attorney-client privilege is narrower than the work-product immunity. Indeed, like the deliberative-process privilege, it must be "strictly confined within the narrowest possible limits." *United States v. Lawless,* 709 F.2d 485, 487 (7th Cir.1983). Its elements are these:

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived. 8 Wigmore § 2292.

*Id.* at 487. Contrary to the assertions of the Board, which are not supported by the cases it cites,[7] the bar of the attorney-client privilege is absolute when it applies. *See, e.g., Lawless,* 709 F.2d at 487 (privileged information is permanently protected un-

less waived); 8 C. Wright & A. Miller, *Federal Practice & Procedure* § 2017 (1970) at 133. Thus, we will not engage in the above-noted balancing process with regard to the two documents which raise the attorney-client privilege issue. Nevertheless, *in camera* inspection is appropriate to make an informed decision as to whether the privilege applies at all. *See In the Matter of Witnesses Before the Special March 1980 Grand Jury,* 729 F.2d 489, 495 (7th Cir.1984); *Lawless,* 709 F.2d at 486, 488 (both district and appellate courts examined documents *in camera* ). Accordingly, we will rule on the availability of the privilege after seeing the two documents, taking into consideration the opposing views of the parties with respect to the issue of confidentiality, as well as the general principles embodied by the privilege.

### 3. *Conclusion*

We order the government to turn over to the Court no later than May 30, 1985, the twenty-seven documents it withheld from discovery. After its *in camera* inspection and its consideration in light of the legal issues expressed above and in the parties' memoranda, the Court will rule very quickly on the extent to which the documents can be produced. We will then be receptive to any necessary motions to change modestly the briefing schedule, should we release some of the documents to the Board. However, we order the parties both to reevaluate their respective positions as to the documents and to meet immediately after receiving this opinion. Perhaps after considering the views we have expressed, the parties can reach an agreement as to the availability or not of some or all of the documents. They are to notify the Court of the results of their meeting no later than May 28, 1985, at 5:00 p.m. To the extent, if at all, the parties do not agree, we will decide the issue. For now, the Board's motion to compel is taken

---

7. *Rizzo,* 97 F.R.D. at 752, involved only the deliberative process privilege and the work-product immunity, both of which are qualified. The attorney-client privilege was not a part of the case. While *Coastal States,* 617 F.2d at 862–63,

did discuss the attorney-client privilege, it never stated that the privilege is qualified. Rather, the opinion focussed on whether the communications at issue were confidential, and thus whether the privilege applies at all.

under advisement, pending production by the United States of the relevant documents for an *in camera* inspection. It is so ordered.