GOVERNMENT SUPPLIERS CONSOL-
IDATING SERVICES, INC., and Jack
Castenova, Inc., Plaintiffs,

v.

The Honorable Evan BAYH, Governor
of the State of Indiana, Defendant.

No. IP 90–303–C.

United States District Court,
S.D. Indiana,
Indianapolis Division.

June 20, 1990.

Ronald J. Waicukauski, White & Raub, Indianapolis, Ind., Bruce L. Thall, Philadelphia, Pa., for plaintiffs.

Harry John Watson III, Michael T. Schaefer, Office of Atty. Gen., Indianapolis, Ind., for defendant.

### ENTRY DENYING PLAINTIFFS' MOTION TO RECONSIDER MAGISTRATE'S ENTRY

TINDER, District Judge.

### I. *Introduction*

This matter comes before the court on the plaintiffs' motion to reconsider Chief Magistrate Godich's entry regarding the plaintiffs' motions to compel discovery and for sanctions. The proper scope of discovery, a recurring theme in this cause of action, highlights the parties' differing views about which issues legitimately arise under the plaintiffs' constitutional challenge to certain Indiana laws regulating the use of landfills located within this state.

The parties' dispute over the proper scope of discovery began with the plaintiffs' attempt to depose Governor Evan Bayh. The defendants filed a motion to quash Governor Bayh's subpoena, which this court granted, in part, because of the Governor's representation that any information he had concerning this case could also be obtained from his advisers, including Barton Peterson, the Governor's Advisor for Environmental Matters, and Kathy Prosser, the Commissioner of the Indiana Department of Environmental Management.

When the plaintiffs deposed Peterson and Prosser, both refused to answer numerous questions by asserting the government deliberative process privilege. This privilege precludes litigation discovery of evidence tending to reveal the decision making process of the executive branch of government. The plaintiffs also requested the production of certain documents from the Governor, who has asserted the same privilege to justify his refusal to produce over one hundred documents. In an affidavit submitted by the Governor's counsel, David F. Hamilton, the documents sought by the plaintiffs are alleged to contain "policy advice, options and recommendations within and among the office of the Governor, the Indiana Department of Environmental Management, the State Board of Health, and other executive branch agencies." Thus, the Governor's counsel concluded that the documents were subject to the "privilege protecting internal policy communications within the government." Pursuant to Southern District of Indiana Local Rule 13, plaintiffs' counsel personally consulted with Hamilton in a good faith effort to resolve their differences over discovery, but were unable to reach an accord. In connection with this consultation, counsel for the plaintiffs did narrow their request to those documents related to the

three statutory provisions at issue.[1] As a result of this narrowing, counsel for the defendant again reviewed the list of documents referred to in Hamilton's affidavit, and determined that sixty-six of the documents discussed in Hamilton's affidavit related to the challenged legislation.

The plaintiffs then filed a motion to compel discovery of the documents withheld by the Governor and a motion for sanctions based upon the allegedly wrongful assertions of the government deliberative process privilege by Peterson and Prosser. The motion to compel asked Chief Magistrate Godich to order the Governor to produce those documents relating to the three statutory provisions at issue in this case. The motion for sanctions requested that Governor Bayh be ordered to submit to a deposition, in the event that Peterson and Prosser continued to assert the government deliberative process privilege, or in the alternative, that the defendant be precluded from introducing evidence relating to the factual bases and policy considerations underlying the statute.

## II. *The Magistrate's Decision*

In an entry dated June 1, 1990, Magistrate Godich denied plaintiffs' motions. In reaching this decision, the magistrate correctly noted that litigants in federal court are entitled to discover all relevant, non-privileged information. He then explored whether the information sought was both relevant and non-privileged. Although the magistrate did not make any findings or conclusions as to specific questions asked of the witnesses or specific requests for documents,[2] he did determine that, as a general rule, the Governor and his aides could assert the government deliberative process privilege, and noted the general types of evidence to which the privilege should attach.[3] After reaching this conclusion, the magistrate next noted that the privilege was not absolute, but qualified. According to the magistrate, the plaintiffs could side step the privilege by establishing "substantial need" for the information.[4] The magistrate concluded that the plaintiffs had failed to show substantial need to side step the privilege because the material sought was irrelevant to the plaintiffs' commerce clause claim,[5] and because alternative sources of evidence were publicly available. Finally, the magistrate concluded that the privilege had not been waived by the Governor's failure to assert it in his affidavit.

## III. *Issues to Be Reviewed and Standard of Review*

The plaintiffs filed a motion to reconsider the magistrate's ruling with the district

---

1. Ind.Code § 13–7–22–2.7(c)(1) (hauler certification); Ind.Code § 13–7–22–2.7(c)(2) (health officer certification); Ind.Code § 13–9.5–5–1 (tipping fee schedule).

2. The magistrate hinted at the limited scope of his holding by stating: "In holding that these deponents could validly claim the privilege, the Court does not decide the validity of each assertion of the privilege. The Court merely decides that the privilege was available to be claimed *as appropriate* and that the assertion of this privilege is not grounds for sanctions." Entry, at 13 (emphasis added).

3. Specifically, the magistrate noted that the privilege was "intended to protect the free flow of information to policy makers in order to provide an environment for the uninhibited consideration of decisional options." Entry, at 3. Thus, the privilege extended to protect documents and testimony reflecting the "thoughts, ideas, opinions, and analyses that encompass the process by which a decision was reached." *Id.* The magistrate excluded from the scope of

the privilege purely factual material and "communications made after the decision and designed to explain it."

4. In determining whether there was substantial need to bypass the privilege, the magistrate noted that five factors are considered: the relevancy of the material sought, the availability of alternative non-privileged forms of evidence, the seriousness of the litigation, the role of the government, and the possibility of a chilling effect on the deliberative process. Entry, at 6–7.

5. The plaintiffs argued in their briefs to the magistrate that the information they sought would reveal the subjective discriminatory motives of the lawmakers who supported the statute, and that this sort of evidence was relevant to their commerce clause claim. The magistrate concluded that the validity of a statute under the dormant commerce clause does not depend on the subjective motivations of the statute's supporters. In their motion to reconsider, the plaintiffs strongly contest the magistrate's conclusion on this point.

court. That motion has been fully briefed by the parties and a speedy ruling is necessary because the trial is scheduled to commence in less than a week. Before turning to a discussion of the merits of the motion, it is important to note what is not at issue. First, no one has claimed or concluded that the plaintiffs are prohibited from discovering the existence of facts, that is, facts that originate outside the deliberative process. Facts that exist independent from the thoughts, ideas, opinions, and analyses that encompass the process by which a governmental decision was reached are not within the privilege asserted by the defendant and his aides, and are fully discoverable to the extent that such facts are relevant to the issues in this case. What is in dispute here is the discoverability of documents or testimony tending to disclose the executive branch's deliberative processes. This includes both evidence of the pure deliberations of the executive branch and evidence containing mixed facts and deliberations. Second, no ruling has been made by the magistrate as to the appropriateness of the assertion of the privilege with respect to any particular question or request for production of a document.

■ With these points in mind, the court can now turn to the merits of the plaintiffs' motion to reconsider. Pursuant to 28 U.S.C. § 636(b)(1)(A) and Southern District of Indiana Local Rule M–5, this court may set aside all or a portion of a magistrate's ruling on a nondispositive pretrial matter if it is "clearly erroneous or contrary to law." Such a ruling by a magistrate is clearly erroneous when, although there is evidence to support it, the district court is left with a definite and firm conviction that the magistrate has committed a mistake. *See Arakelian v. National W. Life Ins. Co.,* 126 F.R.D. 1, 2 (D.D.C.1989); *Princiotta v. New England Tel. & Tel. Co.,* 532 F.Supp. 1009, 1011 (D.Mass.1982); *cf. Merritt v. International Bhd. of Boilermakers,* 649 F.2d 1013, 1017 (5th Cir.1981) (noting that a magistrate's proposed findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(B) are subject to de novo review). Because this court finds Chief Magistrate Godich's ruling to be neither clearly

erroneous nor contrary to law, the plaintiffs' motion to reconsider is DENIED for the reasons discussed below.

IV. *The Government Deliberative Process Privilege*

Because the magistrate's entry contains a thorough analysis of the government deliberative process privilege, this court incorporates that entry here and pauses to discuss only certain aspects of the privilege that merit further comment.

The magistrate correctly identifies the common law as the source of the governmental deliberative process privilege. This privilege has, to some degree, been codified in both the federal Freedom of Information Act, 5 U.S.C. § 552(b)(5), and Indiana's Public Records Act, Ind.Code § 5–14–3–4(b)(6). Although the privilege has been applied most often to members of the federal executive branch, it has come to be applied to the deliberations of state governmental actors as well. *See, e.g., Centifanti v. Nix,* 865 F.2d 1422, 1432 (3d Cir. 1989) (letter from chairman of attorney disciplinary board to state supreme court's chief justice); *Lizotte v. New York City Health & Hosp. Corp.,* 1990 Lexis 5442 (S.D.N.Y. May 8, 1990) (Genfed library, District Court file) (privilege granted in part to documents withheld by governor); *N.O. v. Callahan,* 110 F.R.D. 637, 643 (D.Mass.1986) (privilege extended to state mental health officers). The application of this privilege to the processes of state government is consistent with the principles of federalism on which our government is based. State governments are entitled to preserve the confidences of their decision makers in the spheres in which their authority is retained under the Constitution.

The scope of the privilege, while not entirely clear, is relatively so. According to the Supreme Court, the privilege protects "advisory opinions, recommendations, and deliberations comprising part of a process by which governmental decisions and policies are formulated." *NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 150, 95 S.Ct. 1504, 1516, 44 L.Ed.2d 29 (1975). Magis-

trate Godich defined the scope of the privilege to include "thoughts, ideas, opinions, and analyses that encompass the process by which a decision was reached." Entry, at 3.

██ Perhaps because the privilege cannot be easily capsulized in a scientifically precise definition, the parties raise two disputes over the scope of the privilege. Common sense, informed by a general awareness of the purposes behind the privilege, must be used to resolve questions over the privilege's scope. *Cf. EPA v. Mink*, 410 U.S. 73, 91, 93 S.Ct. 827, 838, 35 L.Ed.2d 119 (1973) (decision to exempt documents containing evidence of government deliberative processes from Freedom of Information Act is to be governed by "flexible, common-sense approach").

██ First, the plaintiffs argue that the scope of the privilege should be limited to documents, and should not extend to testimony.[6] The defendant counters that the plaintiffs' exclusion of testimonial evidence from the privilege threatens to swallow the privilege whole. Unfortunately, neither side is able to point to much case law to support these arguments. Although the plaintiffs support their distinction between testimony and documents with "pinpoint" citations to two Supreme Court decisions, *Mink*, 410 U.S. at 79–95, 93 S.Ct. at 832–40; *Sears, Roebuck & Co.*, 421 U.S. at 137–154, 95 S.Ct. at 1510–1518, one look at the size of the pinpoint citations alone (16 and 17 pages respectively) leads one to wonder whether it is prudent to attribute to the Court a holding that took so many pages to recite. After reading these "pinpoint" cites, the court's initial skepticism is reinforced. These two cases focus only on whether certain documents should be exempted from disclosure under the Freedom of Information Act. The disclosure of testimonial evidence was not at issue in either

case (indeed, the Freedom of Information Act does not apply to testimony); nor do these cases allude to any distinction between testimony and documents with respect to a government deliberative process privilege.

In attacking the plaintiffs' position on this point, the defendant refers back to the purpose of the privilege (protection of deliberative *communications*) to defend the extension of the privilege to testimonial evidence. In addition, the defendant relies on *United States v. American Tel. & Tel. Co.*, 524 F.Supp. 1381, 1386–89 (D.D.C. 1981), which held that testimonial evidence from members of the F.C.C. regarding policy decisions "are clearly privileged." Although the court hesitates to make a broad pronouncement on the correctness of applying the privilege beyond documentary evidence, the defendant's logic and case citations have persuaded me that the privilege should, in this case, encompass all deliberative communications, regardless of the form they take.

Second, the parties differ on whether the privilege ought to protect post-decisional communications. The magistrate held that "communications made after the decision and designed to explain it are not privileged." Entry, at 4. The plaintiffs claim that this means that communications within the executive branch after the statute's enactment are discoverable since they could not have been part of the decisional process leading up to the statute's enactment, but are instead evidence of the creation of a post hoc rationalization (the protection of health and safety). The defendant counters that the decision making process was not completed with the enactment of the statute, but has continued on into the present, and that post-enactment communications should therefore be privileged. The answer to this dispute is suggested by

---

**6.** It is unclear where the plaintiffs would have this court draw the line between unprotected testimonial evidence and protected documentary evidence. The plaintiffs appear to argue that the privilege, if it exists at all, can preclude only the physical production of the document itself. In other words, plaintiffs seem to be suggesting not only that testimony elicited from an aide

about the contents of a conversation with the Governor should be characterized as testimonial evidence, and thus, outside the scope of the privilege, but that testimony elicited from an aide about the contents of a memorandum written to the Governor should *also* be characterized as testimonial, and discoverable.

*Sears, Roebuck & Co.*, 421 U.S. at 159–60, 95 S.Ct. at 1520–21, in which the Court focused on the continuing nature of certain governmental functions. Where the NLRB retains continuing jurisdiction over a complaint, particularly one that is headed for litigation, after the transmittal of an intra-agency memorandum from the General Counsel to the Regional Director of the NLRB, the *Sears* Court held that the intra-agency memorandum fell within the scope of § 5's exemption from the Freedom of Information Act. Similarly, where the executive branch of the state of Indiana has an ongoing responsibility to oversee matters that impact on the environment, including the duty to interpret and enforce a newly enacted statute and defend a lawsuit challenging the constitutionality of that statute, otherwise privileged communications should not lose their privileged status simply because they occur after the statute's enactment. The magistrate is correct that post-decisional communications designed to explain the decision are not privileged, but this conclusion is based on two factual predicates not present in this case: (1) that the communication refers to a *past* decision that is now complete, and (2) that the communication was designed to explain the decision to the public.

■ The magistrate's analysis of whether the defendant has waived the privilege is entirely correct. Governor Bayh's affidavit contains neither an explicit nor an implicit waiver of the government deliberative process privilege. Rather, the affidavit simply states that the Governor's knowledge about the issues in this case is solely derived from his aides. Until the plaintiffs deposed the Governor's aides no one knew what questions would be asked, and thus, no one could know which privileges might arise. It is unreasonable for the plaintiffs to argue that the Governor should have anticipatorily asserted the privilege. The plaintiffs' argument for sanctions is equally unpersuasive.

As Magistrate Godich correctly noted, the assertion of the government deliberative process privilege is not an absolute privilege, but instead is a qualified one which can be sidestepped if the party seeking the information can show substantial need. The magistrate correctly set forward the factors that support such need, and concluded that the plaintiffs fell short on two factors—the relevancy of the material sought under the commerce clause, and the lack of alternative, non-privileged sources. Because of the importance of the magistrate's conclusion concerning relevancy and because the magistrate did not discuss relevancy within the context of the void for vagueness claim, this entry is issued to elaborate on these points. It is also hoped that the following discussion will set the stage for the concise presentation of evidence on the relevant issues at trial.

V. *Relevancy*

The plaintiffs seek a declaratory judgment that the following statutory provisions regarding the hauling of waste are unconstitutional under the commerce clause and the due process clause of the fourteenth amendment: Ind.Code § 13–7–22–2.7(c)(1) (hauler certification); Ind.Code § 13–7–22–2.7(c)(2) (health officer certification); and Ind.Code § 13–9.5–5–1 (tipping fee schedule).[7]

Because the framework for determining the constitutionality of these statutory provisions under the commerce clause differs from the framework for determining whether the provisions are unconstitutionally vague under the fourteenth amendment, this court will discuss first the relevant issues under the commerce clause. Specifically, this court will outline the two tests applied by the United States Supreme Court in analyzing a statute under the commerce clause and then explain why much of the information sought by the plaintiffs in their motion to compel discovery is neither relevant nor likely to lead to relevant evi-

---

7. The plaintiffs have withdrawn their claim for relief based upon the equal protection clause of the fourteenth amendment as originally set forth in count II of their complaint for declaratory judgment.

dence in light of the commerce clause tests. The court will then set forth the method of proving that the statutory provisions are void for vagueness and why the information sought by the plaintiffs is neither relevant nor likely to lead to relevant evidence under this theory.

### A. Commerce Clause

██ A state statute that is alleged to be in violation of the dormant commerce clause will be subjected to one of two tests, depending on the discriminatory nature of the statute. It is settled Supreme Court doctrine that if a statute is discriminatory on its face or in practical effect, then the state bears the burden of justifying it by showing 1) that the statute has a legitimate local purpose; 2) that the statute serves this interest to a substantial extent; and 3) that less discriminatory, alternative means are not available. *See Hughes v. Oklahoma*, 441 U.S. 322, 336, 99 S.Ct. 1727, 1736, 60 L.Ed.2d 250 (1979); *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 353, 97 S.Ct. 2434, 2446, 53 L.Ed.2d 383 (1977); *Dean Milk Co. v. City of Madison*, 340 U.S. 349, 354, 71 S.Ct. 295, 298, 95 L.Ed. 329 (1951). Because it is the stricter of the two tests, this test will be referred to as the "elevated scrutiny test" through the duration of this case.[8]

The second commerce clause test has been succinctly stated by the Supreme Court in *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970): "[w]here the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits."

While all of the parties may agree that there are two separate tests for determining the constitutionality of a state statute under the dormant commerce clause, it is apparent that there is no consensus among the parties, or even among the Justices of the Supreme Court, as to how the tests should be applied. Thus, the parties have a very different view of what evidence is relevant to the commerce clause issues.

The plaintiffs assert that they need certain information that is being withheld by the defendant because it is relevant or likely to lead to relevant information regarding the subjective motives[9] of the governmental actors involved. Plaintiffs suggest that evidence of a discriminatory motive can be used to prove that the defendant's asserted local public interest supported by the statute is nothing more than a pretextual, post hoc rationalization. The defendant counters that evidence of motive is irrelevant in the context of the commerce clause.

The conflict between the parties' positions is a fundamental one. Unfortunately, despite the importance of the issue and the number of scholarly articles written on the subject over the decades, "[t]he Supreme Court's traditional confusion about the relevance of legislative and administrative motivation in determining the constitutionality of governmental actions has ... achieved disaster proportions." Ely, *Legislative & Administrative Motivation in Constitutional Law*, 79 Yale L.J. 1205, 1207 (1970).

The debate over the relevancy of motive under the American legal system is almost

---

**8.** Despite the fact that the elevated scrutiny test is not analogous to the strict scrutiny test used under the equal protection doctrine, the parties have referred to this elevated scrutiny test as a "strict scrutiny test." Aficionados of equal protection jurisprudence will recognize that the three part elevated scrutiny test is really a hybrid of all three equal protection tests. Elements of the rational basis test ("legitimate governmental interest"), the intermediate scrutiny test ("substantially related"), and the strict scrutiny test ("no less restrictive alternative") have been combined to create the commerce clause's elevated scrutiny test.

**9.** One recurring problem in the debate over the issue discussed here is the confusion that results from the loose use of such words as "purpose," "motive," and "intent." This court will use the word "motive" to refer to a lawmaker's subjective anticipated belief about the impact of a statute. (As used in this case, the term "motive" does not include any of the myriad motives that are allowed to flourish in the legislative system, e.g., compromise, porkbarreling, votes along party lines. No one argues that these motives are relevant to the issues in this case.) This court will use the word "effect" to refer to a statute's actual impact.

as old as the system itself. In *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 131, 3 L.Ed. 162 (1810), Chief Justice Marshall, writing for a majority of the Court, held:

> If a legislative act, which the (state) legislature might constitutionally pass, ... be clothed with all the requisite forms of a law, a court, sitting as a court of law, cannot sustain a suit ... founded on the allegation that the act is a nullity, in consequence of the impure motives which influenced certain members of the legislature which passed the law.

When scrutinizing a state statute for an equal protection violation, the Court has vacillated between accepting and rejecting evidence of discriminatory motive. In *Gomillion v. Lightfoot*, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960), for example, the Court struck down Tuskegee, Alabama's gerrymandered city lines on grounds that the city's lawmakers had been racially motivated to redraw the lines to exclude most blacks from the city in order to disqualify them from voting in city elections. The Court refused to consider the discriminatory motive of Jackson, Mississippi's governmental leaders in *Palmer v. Thompson*, 403 U.S. 217, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1970). In that case, the city decided to close all of its public swimming pools rather than comply with a court order to desegregate them. That Court noted that "no case in this Court has held that a legislative act may violate equal protection solely because of the motivations of the men who voted for it." *Id.* at 224, 91 S.Ct. at 1944.

In *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), the Supreme Court held that, within the confines of the first amendment's guarantee of freedom of speech, the motive of Congress in passing a statute outlawing the burning of draft cards was not a basis for declaring the legislation unconstitutional. "It is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." *Id.* at 383, 88 S.Ct. at 1682.

Within the context of the commerce clause, the Court's pronouncements are considerably more vague. While recent Supreme Court opinions have clearly contained discussions of lawmakers' motives, no collection of Justices has yet grounded a majority opinion on the conclusion that the secret motive of the lawmakers was illegitimate. *See, e.g., Maine v. Taylor*, 477 U.S. 131, 148–49, 106 S.Ct. 2440, 2452–53, 91 L.Ed.2d 110 (1986) (in upholding a Maine statute banning the importation of bait fish, Court refuses to find that the state's proffered interest in guarding against environmental disease was a post hoc rationalization); *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 270–71, 104 S.Ct. 3049, 3054–55, 82 L.Ed.2d 200 (1984) (no need to consider secret discriminatory motive, since the state of Hawaii had artlessly proffered a discriminatory local public interest to justify the statute); *Kassel v. Consolidated Freightways Corp.*, 450 U.S. 662, 101 S.Ct. 1309, 67 L.Ed.2d 580 (1981) (Justice Brennan criticizes the plurality opinion and Justice Rehnquist's dissent on grounds that both disregarded evidence of discriminatory motive);[10] *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 471 n. 15, 101 S.Ct. 715, 727 n. 15, 66 L.Ed.2d 659 (1981) (Court assumes that the objectives articulated by the legislature are the actual purposes of the statute, unless an examination of the circumstances forces the Court to conclude that they could not have been a goal of the legislation); *Hughes*, 441 U.S. at 338 n. 20, 99 S.Ct. at 1737 n. 20 (court rejects state's "post hoc rationalization" for the statute not because the rationalization was proffered after the enactment of the statute, but because it was proffered for the first time in front of the Supreme Court); *Hunt*, 432 U.S. at 350–53, 97 S.Ct.

---

**10.** The plaintiffs argue in their reply brief that the plurality opinion in *Kassel* considered evidence of motive when it pointed to a state highway department study that undermined the safety justifications for the statute and the Iowa governor's veto message. To whatever limited extent these forms of evidence are signs of a discriminatory motive, the plurality did not base its decision on this evidence, but on the fact that the statute's effect on safety was nonexistent or counterproductive.

at 2445–47 (Court examines the evidence of an underlying improper motive, but grounds the decision on the fact that the statute failed to substantially further the asserted local public interest and that there were available, less discriminatory alternatives adequate to preserve the proffered local interests); *see also Atlantic Prince, Ltd. v. Jorling,* 710 F.Supp. 893, 901–02 n. 19 (E.D.N.Y.1989) (court discusses internal agency memorandum and legislator's letter to executive branch as evidence of discriminatory motive, but states that such evidence is not necessary to invalidate the statute). More importantly, in none of these decisions has an asserted privilege had to be pierced in order to discover this evidence.

At least a few lower courts have concluded that evidence of discriminatory motive is irrelevant under the commerce clause. *See, e.g., Primary Care Physicians Group, P.C. v. Ledbetter,* 102 F.R.D. 254, 257 (N.D.Ga.1984) ("[E]ven if the plaintiffs can prove that the legislature's reason for passing the statute was improper, the constitutionality of the statute would still be upheld if there was another, legitimate basis for the legislation."); *Apel v. Murphy,* 70 F.R.D. 651 (D.R.I.1976) (because evidence of discriminatory motive was irrelevant, the court refused to order reporters to release their notes from interviews with state lawmakers and lobbyists regarding motives behind recent enactment of a statute regulating commercial fishing).

This court, therefore, agrees with Magistrate Godich's conclusion that evidence of the discriminatory motives of Indiana's lawmakers is irrelevant to the plaintiffs' commerce clause claim. Despite the occasional Supreme Court references to such motive, no opinion has yet held that such evidence is relevant, let alone dispositive. If used at all, such evidence appears to be only considered as part of parenthetical digressions. As noted above, the critical test of motive in connection with the issues of this case is to be judged from an objective perspective, not from a subjective one. Given the highest Court's reluctance to embrace this sort of evidence, this court will not force the state to divulge otherwise privileged evidence simply to allow reference to the evidence as an aside to other reasons upon which the decision will be based. It would be imprudent to allow the invasion of a privileged area merely to permit the subsequent use of that information as legal dictum.

**B. Vagueness Under the Due Process Clause**

■ Besides alleging a violation of the dormant commerce clause, the plaintiffs also claim that the statute is facially vague in violation of the due process clause of the fourteenth amendment.[11] Plaintiffs level this charge against specific parts of the statutory text. First, with respect to the hauler certification,[12] the plaintiffs contend that the words "generated" and "largest part" are too vague to survive constitutional scrutiny.[13] Second, with respect to the health officer certification,[14] the plaintiffs contend that the vagueness of the words

---

11. Because the plaintiffs have not, thus far, indicated whether their due process challenge is a "facial" or an "as applied" attack on the statute, this court assumes that the plaintiffs are making a facial challenge.

12. The hauler certification is contained at Indiana Code § 13–7–22–2.7. This section requires that a hauler certify, under penalty of perjury, which county within Indiana or which state "generated" the "largest part" of the load.

13. Plaintiffs argue that "generated" could mean either the point of origination (the point at which the individual consumer discarded the item) or the point at which the hauler first came into contact with the trash (this could occur when the hauler picks up the trash at curbside or when the hauler picks up the trash at a transfer station).

Plaintiffs argue that "largest part" could mean either weight or volume.

14. The health officer certification, which is contained in Indiana Code § 13–7–22–2.7(c)(2), requires the hauler to present to the landfill operator a "document" from "an officer of a state or local government who has responsibility in that other state for the protection of the public health or the environment" certifying that the solid waste is not subject to regulation under federal hazardous waste laws or Indiana's infectious waste laws, if the "largest part" of the hauler's load was "generated" in a state other than Indiana.

"generated" and "largest part" make it impossible to know which state's health officer is to make this certification. Even if the hauler knew what state "generated" the "largest part" of the hauler's load, plaintiffs contend that the statute fails to identify which health officer within that state may make the certification.[15.]

In order to prevail on a claim of vagueness, the plaintiffs must establish that the statute being attacked is so unclear that "[persons] of common intelligence must necessarily guess at its meaning." *Connally v. General Constr. Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926).[16] Clearly, whether a person of common intelligence must guess at the meaning of a statute will depend on the amount of information concerning the statute that is available to that person. All persons are charged with the responsibility of knowing what the text of the statute itself states.

If the text is so vague that the person of common intelligence must necessarily guess at its meaning, then the statute will be struck down unless there is some extrinsic evidence that adequately narrows the meaning of the statute. Of course, a person of common intelligence is not charged with omniscient knowledge of all extrinsic sources of information about a statute. Rather, a court will consider only certain sources of extrinsic evidence in its attempt to clarify the meaning of an otherwise vague statute.[17] For example, a court can impute to a person of common intelligence knowledge of any limiting construction of the statute that a state court or enforcement agency has proffered. *Grayned v. City of Rockford*, 408 U.S. 104, 110, 92 S.Ct. 2294, 2300, 33 L.Ed.2d 222 (1972). In addition, a person of common intelligence is expected to have a general awareness of the meaning of words, and is expected to look up the meaning of words in dictionaries, sometimes even specialized dictionaries. *See, e.g., Village of Hoffman Estates v. The Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 501 n. 18, 102 S.Ct. 1186, 1194 n. 18, 71 L.Ed.2d 362 (court refers to a general dictionary and a special drug dictionary to discover the meanings of the word "roach" and "roach clip" as those words are used in a municipal ordinance regulating the sale of drug paraphernalia). Finally, in contrast to a dormant commerce clause claim,[18] when a statute is attacked on grounds of vagueness courts will often consider the subjective motives of the governmental actors involved in the enactment of the legislation in an attempt to determine the meaning of a statute. This principle was alluded to in *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), in which Chief Justice Warren wrote for a majority of the Court:

**15.** In reading those parts of plaintiffs' briefs that touch on the subject of vagueness, this court has noted that much attention is devoted to a discussion of the effect on plaintiffs' businesses that would result from attaching certain meanings to the words challenged by the plaintiffs. For example, the plaintiffs allege that if "generated" means point of origination, then they cannot comply with the statute because their haulers have no way of knowing from which state the trash they carry originated. Although plaintiffs seem to be making this allegation to support their claim that the statute is vague, it strikes the court that such an allegation better serves as evidence of the statute's effect on interstate commerce. The establishment of insurmountable hurdles to the importation of solid waste sounds more like a commerce clause problem than a vagueness problem.

This is not to say that the plaintiffs have failed to support their vagueness claim. Rather, this court is simply suggesting that it would be helpful to the court if the parties would more clearly delineate their claims and the evidence that supports each one.

**16.** As this court has already indicated on page 33 of its April 3, 1990 entry regarding plaintiffs' motion for a preliminary injunction, vague statutes are void because they fail to provide fair warning to those who risk acting in violation of the law and because they fail to provide explicit standards to those who enforce the law.

**17.** The type of regulation at issue and the sophistication of the entity subject to the regulation will affect the size of the body of extrinsic evidence that may be considered by the court in resolving a claim of vagueness. *See Village of Hoffman Estates v. The Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982) (businesses affected by economic regulations are expected to have the resources to pursue clarifications of the meaning of a statute).

**18.** *See supra,* at 537–539.

Inquiries into congressional motives or purposes are a hazardous matter. When the issue is simply the interpretation of legislation, the Court will look to statements by legislators for guidance as to the purpose of the legislature, because the benefit to sound decision-making in this circumstance is thought sufficient to risk the possibility of misreading Congress' purpose.

*Id.* at 383–84, 88 S.Ct. at 1682 (footnote omitted).

Thus, the person of common intelligence has been held responsible for knowing the content of the available legislative history of a statute. *United States v. National Dairy Prods. Corp.*, 372 U.S. 29, 33–34, 83 S.Ct. 594, 598–99, 9 L.Ed.2d 561 (1963) (corporate criminal defendant challenging the constitutionality of section 3 of the Robinson–Patman Act, which outlawed the sale of goods at "unreasonably low prices for the purpose of destroying competition," could have discerned meaning of the statute by reference to the legislative history contained in the Congressional Record). Although Indiana has no official legislative history, the plaintiffs have already discovered documents and testimony tending to reveal the subjective motives of certain key legislators and certain members of the executive branch of Indiana's government. This publicly available extrinsic evidence may indicate the meaning that should attach to the words and phrases being attacked by the plaintiffs.[19]

What plaintiffs seek to discover through their motion to compel, however, are the *secret* discussions and documentary exchanges that occurred within the executive branch and between the executive and the legislative branch. Clearly, no court can charge a person of common intelligence with responsibility for knowing the contents of secret legislative history, or the secret enforcement plans of the executive. Because of this, the secret motives of the Bayh administration and the legislative

players are not relevant to the issue of vagueness. If the statute is unconstitutionally vague, it is because the text itself is vague and the *public* extrinsic evidence available to the person of common intelligence does not adequately clarify the meaning of the statute. Secret governmental conversations or memoranda, not currently known to the plaintiffs, cannot transform an otherwise clear statute into an unconstitutionally vague one.

## VI. *Conclusion*

For all the above reasons, the magistrate's entry denying plaintiffs' motion to compel and request for sanctions was correctly decided. The plaintiffs' motion to compel seeks the disclosure of documents and testimony apparently within the government deliberative process privilege, and the plaintiffs have failed to show that their request is likely to lead to evidence relevant to either of their constitutional claims.

However, this does not dispose of the parties' discovery dispute. As was mentioned earlier in this entry, the magistrate's entry did not apply the conclusions reached to every assertion of the privilege. Because the contours of the privilege were undefined before the magistrate's entry as supplemented by this entry, a more specific ruling is appropriate.

■ With respect to those documents listed in Hamilton's affidavit, the defendant has adequately described the documents to show to this court's satisfaction that their contents are either entirely privileged, or that non-privileged information contained in them, if any, is so intertwined with thoughts, ideas, opinions and analyses encompassed in the deliberative process that disclosure of redacted portions of the documents would disclose the deliberations themselves. This was accomplished by the submission of a detailed listing of the documents and an adequate description of their contents.[20]

---

**19.** While the public pronouncements of most government officials are relevant to the issue of vagueness, the weight accorded to these various statements will vary.

**20.** The defendant argues that even an *in camera* review of the allegedly privileged documents violates the privilege to a certain degree, and that such a review is not to be ordered simply

With respect to the testimony of Prosser and Peterson, the plaintiffs are entitled to complete their depositions, with these witnesses also free to assert the government deliberative process privilege when proper. The plaintiffs should carefully phrase their questions so that the answers do not call for the disclosure of privileged information. If the parties disagree about the "call of a question," the plaintiffs are to submit a copy of the question to the court so that the court can determine whether the witness should be instructed to answer the question. As to those specific questions listed in plaintiffs' motion for sanctions, this court has reviewed them in light of this entry. None of the challenged questions put to Prosser will be ordered to be answered because they all seek to elicit privileged information, and thus, none need to be answered. Only two of the questions put to Peterson are ordered to be answered: questions in ¶¶ 19(mm) and 19(rr) of the plaintiffs' motion for sanctions.[21] Some of the other questions put to Prosser and Peterson called for factual information intermixed with privileged testimony. The plaintiffs may be able to gain the factual information by rephrasing the questions to

exclude inquiries into the deliberative process.

## ENTRY

JOHN PAUL GODICH, United States Magistrate.

This matter comes before the Court on the plaintiffs' motions to compel discovery and for sanctions. The items sought by the motion to compel are documents currently held by the defendant, Indiana Governor Evan Bayh, who has, by affidavit of counsel, asserted the deliberative process privilege. Both parties have filed exhaustive briefs in support of their respective positions. The Court, having considered the foregoing and being duly advised, now denies the plaintiffs' motions.

The plaintiffs, Government Suppliers Consolidating Services, Inc. and Jack Castenova, Inc., are in the business of hauling and depositing solid waste in designated venues throughout the United States. A portion of their cargo has routinely been transported to landfill sites located in the State of Indiana. During the 1990 legisla-

because the plaintiffs contest the government's assertion of the privilege. Rather, *in camera* inspection is to be ordered only after the court has first tried to determine whether the privilege is well founded and whether the party seeking the information is likely to be entitled to some discovery of the document.

Defendant cites *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena,* 40 F.R.D. 318, 330–33 (D.D.C. 1966), *aff'd,* 384 F.2d 979 (D.C.Cir.), *cert. denied,* 389 U.S. 952, 88 S.Ct. 334, 19 L.Ed.2d 361 (1967), in support. That case stands for the proposition that *in camera* inspections are not to be routinely ordered without a careful review of the likelihood that discoverable information is contained in the document and without a balancing of the need for disclosure of the information against the risk of disclosure of the privileged information. However, in that case the governmental entity asserting the privilege, the United States, was not a party to the lawsuit. Thus, "no problem of an unfair litigating advantage" was presented. *Id.* at 329. Moreover, that case also expressed the corollary to the above concerns:

> While an *in camera* inspection is, just to that extent, a contraction of the privilege, courts should not hesitate to make a private examination of disputed materials upon a reasonable showing that it can serve a purpose truly

useful to a party actually or potentially entitled to some discovery, for in no other way can judicial responsibility be discharged.

*Id.*

While this court determines that it would be empowered to conduct an *in camera* examination of the sixty-six documents in question, such an examination is not required here. The defendant has made a sufficiently detailed showing of the type of information contained in each document, as discussed in *Vaughn v. Rosen,* 484 F.2d 820, 826–28 (D.C.Cir.1973); *Kimberlin v. Department of Treasury,* 774 F.2d 204, 210 (7th Cir.1985). Thus, no other examination is necessary in this case.

21. The question in ¶ 19(mm) reads as follows: "Whether, in considering the health officer certification provisions the administration or Mr. Peterson had any facts or evidence different from conclusions reached in the Draft Report of the Agency for Toxic Substances and Disease Registry on the Health Impacts of Medical Wastes [Exhibit "D" at 153–154]."

The question in ¶ 19(rr) reads as follows: "Whether the Bayh administration had data to confirm or deny if waste generated in Indiana disposed of outside of state exceeded that coming into Indiana from out-of-state [Exhibit "D" at 193]."

tive session, the Indiana General Assembly enacted a statute proposed by Governor Bayh which regulates solid waste disposal in Indiana. The plaintiffs charge that three provisions of House Enrolled Act 1240 (H.B. 1240) are in violation of the Commerce Clause of the United States Constitution, Article 1, Section 8, Clause 3, and have filed the current action seeking to have the statute invalidated.

The plaintiffs claim that the statute unconstitutionally discriminates against out-of-state solid waste disposal businesses by placing greater burdens on them than on similarly engaged Indiana businesses. The defendants, on the other hand, insist that the statute was enacted to protect the health and safety of the state citizenry from dangers associated with infectious and hazardous waste. The documents at issue deal with the governor's efforts to develop an effective solid waste management policy and were generated by and between the Office of the Governor, the Indiana Department of Environmental Management, the Indiana State Board of Health, and other executive advisors. They cover a period dating from April 18, 1989 through March 13, 1990, the final day of the 1990 session of the General Assembly.

According to the Federal Rules of Civil Procedure, a party is entitled to request discovery of all unprivileged, relevant evidence held by his opponent. *Fed.R.Civ.P.* 26(b)(1). Once a claim of privilege is asserted, however, the court is called upon to determine whether the documents in question are indeed protected from disclosure. In absence of a specific rule or statute creating a privilege, Federal Rule of Evidence 501 directs courts to evaluate such a claim in light of common law as interpreted by judicial reasoning and experience. *Memorial Hospital of McHenry County v. Shadur,* 664 F.2d 1058, 1061 (7th Cir.1981). At present, Congress has expressly provided for the deliberative process privilege only in Section 552(b)(5) (Exemption 5) of the Freedom of Information Act (FOIA). The Act specifically regulates the disclosure of documents generated by a federal agency and has been the source of most litigation involving the privilege. In the light of the foregoing, the Court will the evaluate the defendants' assertion of privilege under the common law.

The deliberative process privilege is intended to safeguard the free flow of information to policy makers in order to provide an environment for the uninhibited consideration of decisional options. *National Labor Relations Board v. Sears, Roebuck & Co.,* 421 U.S. 132, 150–51, 95 S.Ct. 1504, 1516–17, 44 L.Ed.2d 29 (1975); *United States v. Morgan,* 313 U.S. 409, 422, 61 S.Ct. 999, 1004–05, 85 L.Ed. 1429 (1941); *N.O. v. Callahan,* 110 F.R.D. 637, 642 (D.Mass. 1986); *United States v. Exxon Corp.,* 87 F.R.D. 624, 636 (D.D.C.1980). Courts have repeatedly recognized that the prospect of public disclosure of such communications could inhibit frank discussion in delicate policy areas. *Environmental Protection Administration v. Mink,* 410 U.S. 73, 89, 93 S.Ct. 827, 836, 35 L.Ed.2d 119 (1973); *Green v. Internal Revenue Service,* 556 F.Supp. 79, 84 (N.D.Ind.1982), *aff'd,* 734 F.2d 18 (7th Cir.1984). Consequently, documents reflecting the "administrative reasoning process," *Kaiser Aluminum and Chemical Corp. v. United States,* 157 F.Supp. 939, 946, 141 Ct.Cl. 38 (1958), or thoughts, ideas, opinions, and analyses that encompass the process by which a decision was reached have been found to be confidential. *Mink,* 410 U.S. at 89, 93 S.Ct. at 836; *Morgan,* 313 U.S. at 422, 61 S.Ct. at 1104; *King v. Internal Revenue Service,* 684 F.2d 517, 519 (7th Cir.1982).

Notwithstanding the foregoing, communications made after the decision and designed to explain it are not privileged. Nor is factual material upon which the thoughts, ideas, recommendations, or opinions are based unless it is so intertwined with privileged material that it cannot be easily severed. *Mink,* 410 U.S. at 88–91, 93 S.Ct. at 836–38; *see also Sears,* 421 U.S. at 151, 95 S.Ct. at 1517. Moreover, when the privilege does apply it is qualified rather than absolute and may be overcome if the party seeking discovery shows substantial need for the otherwise privileged mate-

rial. *United States v. Board of Education of City of Chicago,* 610 F.Supp. 695 (N.D. Ill.1985).

Although the deliberative process privilege has been principally addressed in the FOIA context, federal courts has recognized its applicability in a number of contexts involving similar internal communications to decision makers. *E.g., Centifanti v. Nix,* 865 F.2d 1422 (3d Cir.1989) (privilege extended to those charged with establishing rules governing the conduct of attorneys); *In re Grand Jury,* 821 F.2d 946 (3d Cir.1987), *cert. denied, sub nom Colafella v. United States,* 484 U.S. 1025, 108 S.Ct. 749, 98 L.Ed.2d 762 (1988) (indicating that in certain circumstances the privilege may be extended to state legislators); *Equal Employment Opportunity Commission v. University of Notre Dame Du Lac,* 715 F.2d 331 (7th Cir.1983) (extended the privilege to university tenure committees); *N.O. v. Callahan,* 110 F.R.D. 637 (D.Mass.1986) (privilege extended to state mental health officers); *Lizotte v. New York City Health and Hospital Corp.,* 1990 U.S.Dist.LEXIS 5442 (S.D.N.Y. May 8, 1990) (privilege granted in part to certain documents withheld by governor). The common law development of the privilege warrants its recognition in the context of the deliberative process integral to the State's executive office. The governor is necessarily involved in policy making on a daily basis, often in areas of intense public interest. Protection of the confidentiality of communications made at the highest levels of state government is important to ensure well developed state policy.

In determining the applicability of the privilege in a given case, the court is required first to consider whether the proponent properly asserted the privilege. Once this has been established the court must proceed to weigh the litigant's need for disclosure against the government's and the public's need for secrecy in the decision making process. *Board of Education,* 610 F.Supp. at 698; *see also Sears,* 421 U.S. at 149 n. 16, 95 S.Ct. at 1516 n. 16; *Zenith Radio Corp. v. United States,* 764 F.2d 1577, 1579 (Fed.Cir.1985), *aff'd,* 783 F.2d 184 (1984). In order to satisfy the first component, the party asserting the privilege must 1) have an official of the relevant governmental entity make a formal claim of privilege after personally reviewing the documents, 2) have the official demonstrate by affidavit the precise reasons for preserving the confidentiality of the documents, and 3) specifically identify and describe the documents. *See Board of Education,* 610 F.Supp. at 698; *Department of Energy v. Brett,* 659 F.2d 154, 155 (Temporary Emergency C.A.1981), *cert. denied, sub nom Cotton Petroleum Corp. v. Edwards,* 456 U.S. 936, 102 S.Ct. 1992, 72 L.Ed.2d 456 (1982).

In the instant case the governor's counsel asserted the privilege via affidavit and then listed sixty-six documents or series of documents claimed to be confidential. The items are not listed consecutively indicating prior disclosures have been made. Moreover, the list specifically states that certain non-privileged items were produced from otherwise confidential files. The documents claimed as privileged are, as noted, from advisors to the governor and various agency heads and staff personnel. The content of each is specifically described and clearly relates to the administration's attempts to formulate a statewide solid waste disposal policy. The governor's designee adequately demonstrated the applicability of the deliberative process privilege in the instant case. The Court is, therefore, required to balance the plaintiffs' need for the material against the government's interest in maintaining the confidentiality of its decision making process.

In attempting to determine whether the plaintiffs have demonstrated a need sufficient to overcome the defendants' assertion of the privilege, the Court may consider the relevancy of the material sought, the availability of other evidence, the seriousness of the litigation, the role of the government, and the possibility of a chilling effect on the deliberative process. *Federal Trade Commission v. Warner Communications, Inc.,* 742 F.2d 1156, 1161 (9th Cir.1984). In the instant case, the plaintiffs contend that discovery is necessary to determine whether the governor had parochially discrimina-

tory motives in proposing the solid waste legislation.

The Supreme Court has established a two-tier approach for analyzing cases involving state statutes alleged to violate the Commerce Clause. When a statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests, the Court has deemed it invalid per se. *E.g., Bacchus Imports, Ltd. v. Dias,* 468 U.S. 263, 270, 104 S.Ct. 3049, 3054–55, 82 L.Ed.2d 200 (1984) (Court considered both effect on interstate commerce and legislative motivation where undisputed purpose of statute was to aid Hawaiian industry); *City of Philadelphia v. New Jersey,* 437 U.S. 617, 626, 98 S.Ct. 2531, 2536, 57 L.Ed.2d 475 (1978) (legislative motivation irrelevant since effect of the statute directly discriminated against interstate commerce). When, however, a statute has only indirect effects on interstate commerce and regulates evenhandedly, the court must determine whether the state has a legitimate local interest for the intrusion which outweighs the burden on interstate commerce. *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970). In either case, the critical consideration is the overall effect of the statute on both local and interstate activity. *Brown–Forman Distillers v. New York State Liquor,* 476 U.S. 573, 578, 106 S.Ct. 2080, 2084, 90 L.Ed.2d 552 (1986). Although the Court has on occasion referred to legislative motive or purpose when invalidating a statute, it is clear that the overriding factor has remained the statute's objective burden on interstate commerce. *See, e.g., Kassel v. Consolidated Freightways Corporation,* 450 U.S. 662, 101 S.Ct. 1309, 67 L.Ed.2d 580 (1981) (note that a majority of the Court declined to subscribe to Justice Brennan's concurrence advocating specific consideration of motive).

The United States District Court for the District of Rhode Island had occasion to address the discoverability of legislative motivation underlying facially discriminatory statutes in *Apel v. Murphy,* 70 F.R.D. 651 (D.R.I.1976). The plaintiffs in *Apel* were a group of fishermen seeking the invalidation of a Rhode Island statute that prohibited out-of-state boats from fishing in its waters. The stated purpose of the statute was conservation. The plaintiffs charged that this purpose was merely pretextual and that the law was actually intended to discriminate against out-of-state fishermen. In an effort to prove this allegation they subpoenaed documents from local reporters which were said to reflect statements made by the governor and various legislators confirming the truth of their charge. The court quashed the subpoena holding that possible illegitimate motivations for desiring the enactment of the statute were not relevant to the ultimate question of whether the statute violated the Commerce Clause. *See Primary Care Physicians Group, P.C. v. Ledbetter,* 102 F.R.D. 254 (N.D.Ga.1984) (discussing *Apel* with approval).

In the instant case, the defendants have offered a legitimate local interest in support of the statute. The crucial issue to be resolved is, therefore, whether the resulting burden on interstate commerce outweighs the putative benefits to the local community. Precedent in the Commerce Clause area has placed little emphasis on the motivations for enacting a specific piece of legislation. Rather courts are required to focus primarily on the statute's impact on interstate commerce. Accordingly, an inquiry into underlying motivations is not particularly relevant in determining whether the instant statute violates the Commerce Clause.

Moreover, even assuming relevance it is not clear that justifications espoused contemporaneously with the initial formulation of the policy are particularly valid at this juncture. As the deliberative process advanced within the governor's office those persons involved undoubtedly offered a myriad of reasons for instituting controls on the growing problem of solid waste. Some reasons may have been rejected outright while others were maintained for a time only to be repudiated later. It is precisely this give and take which the deliberative process privilege was designed to

protect. Ultimately, the process rendered a final decision tailored to reflect the convergence of the advice, recommendations, and opinions generated pursuant thereto. Then this policy statement was presented to the General Assembly where it was debated, amended, and ultimately passed by legislators whose motives are unknown. Consequently, it is conceivable that the motivations discussed within the privileged communications may have had no impact on the final statute. After considering the foregoing, the Court finds that the government's interest in maintaining candid discussion inside the executive branch easily outweighs the litigant's minimal need for the documents at issue.

Furthermore, the plaintiffs have identified several public, non-privileged items of potential evidence that allegedly demonstrate the illegitimacy of the defendants' motives. To name but a few they refer to Governor Bayh's State of the Union Address, press conferences and several newspaper articles. Even though the Indiana General Assembly does not generate a legislative history, the availability of these alternative sources of information concerning legislative purpose significantly tips the balance against the disclosure of privileged documents.

Finally, the plaintiffs argue the even if the deliberative process privilege is found to be appropriate, the defendants have waived it. First, they claim that the privilege was not timely asserted since it was not raised in the defendants' admissions or interrogatories or in Governor Bayh's affidavit. The Court finds, however, that the privilege was appropriately and timely raised in the affidavit filed by the governor's counsel. Likewise the Court does not believe that the defendants waived the privilege by articulating local health and safety interests. A waiver occurs when a party puts communications within the privilege in issue. *National Union Fire Ins. Co. v. Continental Illinois Group*, 1988 WL 79521 (N.D.Ill.1988). Typically, such conduct involves the disclosure, without limitation, of a privileged communication, *e.g. Powers v. Chicago Transit Authority*, 890 F.2d 1355, 1359 (7th Cir.1989), or the assertion of an affirmative defense which relies on privileged information, *e.g. Lorenz v. Valley Forge Ins. Co.*, 815 F.2d 1095, 1097 (7th Cir.1987).

The assertion of legitimate local interest is not in itself such a defense that necessarily implicates privileged information and constitutes a waiver. Similarly, there is no evidence that the defendants divulged any privileged information and therefore the deliberative process privilege has not been waived by disclosure.

The Court now turns to the plaintiffs' motion for sanctions. The plaintiffs contend that the defendants and their agents failed to act consistently with the affidavit submitted to the Court by Governor Bayh and should, therefore, be penalized. In his affidavit offered in support of defendants' motion for protective order, Governor Bayh asserted that Kathy Prosser and Barton R. Peterson possessed all of the relevant information known to him concerning the factual bases for, and the policy considerations supporting, the challenged portions of H.B. 1240, all other aspects of Indiana's solid waste management policies and programs, and the legislative process leading to the enactment of the statute. The Court granted a protective order finding the deposition of the governor to be inappropriate, in part because of the availability of the information from other sources. However, when Prosser and Peterson were deposed they asserted the deliberative process privilege on several occasions.

The assertions of privilege by the deponents and their counsel does not warrant sanctions. The plaintiffs cite two cases intended to support their motion: *Dellums v. Powell*, 566 F.2d 231 (D.C.Cir.1977) and *Nemmers v. United States*, 681 F.Supp. 567 (C.D.Ill.1988), *aff'd*, 870 F.2d 426 (1989). In each case the offending party blatantly failed to comply with discovery rules. The *Dellums* court dismissed the plaintiff's complaint after he had repeatedly failed to provide discovery that should have been made available in the first instance. Sanctions were awarded in *Nemmers* based on the defendant's failure to prepare its expert witness for a scheduled deposition. The court termed the trip to Chicago by plaintiff's counsel "a monumen-

tal waste of time." No such abuse occurred here.

Defendant's argument reads too much into the governor's affidavit. The governor merely asserted that the potential deponents possessed the same information that he did and proffered them as witnesses. He did not thereby waive the privilege that they *all* possessed. During the depositions, the defendants appropriately asserted the deliberative process privilege which this Court herein recognizes as applying to the internal decision making communications underlying the governor's solid waste management policy. Therefore, the material falling therein is not now, nor was it ever, discoverable. Similarly, even though the defendants were unable to secure the hoped for information it is unlikely that they did not anticipate the assertion of the privilege. The Court, in its discretion, does not believe that sanctions are warranted in the instant case since no blatant violation of the rules has been established.

In holding that these deponents could validly claim the privilege, the Court does not decide the validity of each assertion of the privilege. The Court merely decides that the privilege was available to be claimed as appropriate and that the assertion of this privilege is not grounds for sanctions.

Accordingly, the Court denies the plaintiffs' motion to compel and motion for sanctions.